IN RE JUVENILE APPEAL (ANONYMOUS) *v.*
COMMISSIONER OF CHILDREN AND YOUTH
SERVICES*

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book, 1978, § 3161, it is ordered that the names of the parties involved in this appeal shall not be disclosed and that the records and briefs shall not be distributed to the various libraries of the state by the Reporter of Judicial Decisions. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of this court.

Argued April 10—decision released June 12, 1979

*Frank B. Cochran,* with whom were *Albert Hilburger* and, on the brief, *Martha Stone* and, of the New York bar, *Martin Guggenheim* and *Bruce Ennis,* for the appellant (plaintiff).

*Carol Feinstein,* assistant attorney general, with whom were *Paul M. Shapiro,* assistant attorney general, and, on the brief, *Carl R. Ajello,* attorney general, for the appellee (defendant).

*Robert I. Reardon, Jr.,* for the minor child.

PETERS, J. This is an appeal by the plaintiff, the mother of a seven year old girl, from the judgment of the Superior Court dismissing her appeal from the Juvenile Court. The Juvenile Court had denied the plaintiff's petition, pursuant to General Statutes § 17-62 (f), (now § 46b-129 (f)), to revoke the commitment of her daughter to the defendant commissioner of children and youth services, and had simultaneously granted the commissioner's petition, pursuant to General Statutes § 17-43a, to terminate the plaintiff's parental rights. The plaintiff also appeals from the denial by the Juvenile Division of the Superior Court of her motion for immediate visitation.

In order fully to understand the unfortunate situation with which this court is confronted, it is necessary to spell out in some detail the sequence of events that led to this appeal. In January, 1972, the plaintiff gave birth to her only child, the daughter whose custody is in issue in this case. Because her husband had previously been paralyzed and severely disabled, and was unable to work, the plaintiff, who had been supporting her family since 1967, returned to work when her child was four months old in order to continue to support her family and to avoid welfare. During her mother's working hours, the child was left with a reliable babysitter, as her father was physically incapable of caring for her. When the child was nine months old, the mother changed babysitters and the child was thereafter cared for during the day by Mrs. M., a prominent figure in this appeal. From November, 1972 until July, 1975, Mrs. M. cared for the child on working days from approximately 9 a.m. until 5 p.m. At all other times, the child was in the custody and care of her mother.

On July 16, 1975, the plaintiff encountered unforeseeable difficulties in relation to the custody of her child. That morning, the plaintiff left her daughter, then three and one half years old, with Mrs. M. for routine day care. Because she had been feeling somewhat nervous and depressed, the plaintiff proceeded to consult a doctor, who, after a brief consultation, immediately referred her to a psychiatrist. The psychiatrist, after speaking with the plaintiff for only 15 or 20 minutes, diagnosed her as suffering from a "mental disability," and involuntarily committed her to the Norwich State Hospital. She remained confined at the Norwich State Hospital for approximately six weeks, and, although she lost 30 pounds during her stay, the correctness of the original diagnosis was apparently not questioned. The plaintiff's daughter, meanwhile, was being cared for full time by the babysitter, Mrs. M., who brought the child to see her mother several times during her confinement at Norwich.

With the help of her sister, the plaintiff was able to obtain her release from Norwich in early September of 1975. Still very sick and seriously underweight, she traveled to her family's home in Maine and after two days was admitted to the Eastern Maine Medical Center in Bangor, Maine. There she was accurately diagnosed as suffering from acute hyperthyroidism and began receiving appropriate treatment. She remained in the Maine hospital until late October of 1975, there regaining her weight and her physical and emotional strength.

The plaintiff's daughter, who during the three and one half month period of her mother's illness had lived in the home of Mrs. M., was on October 21, 1975, adjudicated an "uncared for" child and committed to the defendant commissioner of children

and youth services. She remained in the home of Mrs. M., who was designated as her foster mother and who received monthly foster care benefits. The plaintiff, still hospitalized in Maine, was unable to appear at the October 21 commitment hearing, but an attorney for her husband did appear and stated that although the plaintiff did not consent to the "uncared for" adjudication, she was aware that foster care was at that time the best option for her daughter.[1] One week after the commitment of her daughter to the commissioner of children and youth services, the plaintiff was released from the Maine hospital and went to live with her mother in Maine to continue her convalescence. Soon thereafter she began her efforts to regain custody of her daughter.

Within a week after her discharge from the Maine hospital, the plaintiff contacted her child's social worker from the department of children and youth services (hereinafter DCYS) to inquire about getting her back. He informed her that a Maine social worker would first have to confirm her recovery, but that there should be no problem about her daughter's return to her custody. An initial investigation in December, 1975 by the Maine counterpart to the DCYS revealed that the plaintiff had not yet recovered sufficiently to care for her child on a full-time basis. A second investigation in February, 1976, however, was favorable to the plaintiff, and the Maine social worker then felt that she was ready to care for her child.

The plaintiff testified that during this period of recuperation she wrote to her daughter every day

[1] The plaintiff's attorney admitted at oral argument that the original commitment, even if erroneous, is now moot: it has not been challenged.

and telephoned her about three times per week. She made no visits to Connecticut during this period because she believed she would not be allowed to see her daughter without prior DCYS approval, and had no money for a seemingly futile trip. The plaintiff also testified that for several months no one at the DCYS returned her calls and that she was eventually told that the original social worker had left the agency and no new social worker had yet been assigned to her case. She heard from no one at the DCYS from November, 1975 until April 8, 1976, when the child's new social worker contacted her by letter.[2] The plaintiff then came to Connecticut immediately and had several visits with her daughter during the week of April 12. She also retained a Connecticut lawyer to institute proceedings to revoke her daughter's commitment to the defendant. She then returned to Maine to await court action[3] and resumed communication with her daughter by letters and telephone calls.[4]

---

[2] Despite the claims of the DCYS that it was the caseworker's contacts with the plaintiff that encouraged her to visit her daughter, the facts seem otherwise. The initial letter from the new caseworker, after four months of official silence from the DCYS, was peculiarly uninformative and did not even mention the possibility of visitation. The letter merely stated: "[Your daughter] is continuing in the care of [Mrs. M.]. She is developing well and seems to be a very effervescent young girl. If you feel the need to contact me at any time, I can be reached at the above address or by phone. . . . I hope to keep you informed on [your daughter] and her future progress."

[3] For reasons that are unclear, the plaintiff's lawyer did not file the petition to revoke commitment until June 30, 1976, and the first Juvenile Court hearing on her petition was not scheduled until September 9, 1976.

[4] The plaintiff testified that she returned to Maine and did not come back to Connecticut until the time of the scheduled court hearing in September, 1976, because she had no money and no place to stay. She did not wish to impose on relatives of her husband, with whom she was then involved in divorce proceedings.

An initial hearing on the plaintiff's motion to revoke commitment was held on September 9, 1976. At that time the DCYS admitted that they had favorable reports on the plaintiff's condition from the Maine social worker and that they hoped to recommend that the child be returned to her mother. There was some concern about recent behavioral problems exhibited by the child and the parties agreed upon a two month continuance to allow the child to be evaluated by the New London Child Guidance Clinic.[5] During this two month period, the plaintiff was allowed by the DCYS to visit her daughter three times a week, for several hours a day on Sundays, Tuesdays, and Thursdays; no overnight visits, however, were allowed. At that time, and throughout the course of the Juvenile Court proceedings, the plaintiff was living with relatives of her husband.

The second hearing on the plaintiff's petition to revoke commitment was scheduled for November 4, 1976. Since the evaluation from the Child Guidance Clinic had only recently been received, a second continuance was requested in order for the parties to examine the reports from the clinic. The attorney for the DCYS at this hearing informed the court that child and mother had been visiting three times a week, and that "there have been some problems, but things are going along." Yet that very day, because of some perceived behavioral problems in the child, the plaintiff's visitation rights were

[5] The significance of the fact that an appointment for evaluation of behavioral problems had been set up by the DCYS *before* the institution of regular visits by the plaintiff will be discussed, infra.

reduced by the DCYS to once weekly, and soon thereafter to every other week. On November 30, 1976, the DCYS filed a petition to terminate parental rights.

At the third hearing on the plaintiff's petition to revoke commitment, on December 14, 1976, the case was once again continued because of the intervening petition by the DCYS to terminate parental rights, and because the parties desired time to request that a further study be done by the Yale Child Study Center. The parties also requested that the plaintiff's petition for revocation and the defendant's petition for termination be heard simultaneously. Although the attorney for the DCYS conceded that there was still a chance for the plaintiff to regain custody, she stated that it was the intention of the DCYS, if successful on the termination petition, to place the child for adoption with Mrs. M. and her husband, the foster parents.

After the Yale Child Study Center declined to do an evaluation in this case, a joint trial on the petitions for revocation and for termination was finally begun on February 7, 1977, one year after the plaintiff had been evaluated as fit to resume custody by the Maine social worker. Testimony occupied several days in February and March, and on April 20, 1977, the Juvenile Court rendered its decision denying the plaintiff's petition for revocation of commitment, terminating the parental rights of the plaintiff and her husband, and appointing the defendant commissioner of children and youth services as statutory parent for the purpose of placing the plaintiff's daughter in adoption with Mr. and Mrs. M. The plaintiff's visitation rights

also were severed at the time of this decision. The Juvenile Court subsequently denied the plaintiff's motions for custody and for visitation rights pending the appeal.

The plaintiff appealed to the Superior Court, on April 26, 1977, from the decisions of the Juvenile Court.[6] The Superior Court, on December 21, 1978, found the issues for the defendant and entered a judgment dismissing the appeal. From that judgment, the plaintiff appealed to this court, assigning as error, inter alia: (1) the denial of her petition to revoke commitment; (2) the granting of the defendant's petition to terminate parental rights in the absence of one or more statutory grounds therefor; and (3) the failure to find that Connecticut's parental rights termination statute, General Statutes § 17-43a, violates the due process clauses of the federal and state constitutions. The plaintiff's August 2, 1978, motion for immediate visitation pending appeal was denied by the Juvenile Division of the Superior Court, and from that denial the plaintiff has also appealed.[7]

The petitions for revocation of commitment and for termination of parental rights, although tried together by stipulation of the parties, present separate issues governed by different sections of the General Statutes. The criteria for granting each of the motions are clearly distinguishable and the issues must therefore be dealt with separately.

---

[6] The plaintiff's husband did not appeal from the judgment terminating his parental rights.

[7] Aside from one chance encounter in a restaurant in November, 1977, it appears that the plaintiff has not been allowed to see her daughter since the April 20, 1977, judgment of the Juvenile Court.

## I

The plaintiff brought her petition for revocation of commitment pursuant to § 17-62 (f) of the General Statutes.[8] (Now § 46b-129 (f).) In the petition the plaintiff sought return of custody of her daughter, alleging: "1. The reason for the commitment no longer exists, [and] 2. Revocation would be in the best interests of said child." At the time the petition was filed, the plaintiff had fully recovered from her illness and had been found capable, by the Maine counterpart of the DCYS, of regaining the care and custody of her daughter. Accordingly, the DCYS concedes that the cause for the commitment of the child to the commissioner, i.e., the plaintiff's illness, no longer existed when the plaintiff's petition was filed. The DCYS disputed and still disputes, however, that return of the child to her mother was or is in the child's best interests because of the intervening attachment that formed between the child and her foster family during her mother's illness.

---

[8] "[General Statutes] Sec. 17-62. . . . (f) REVOCATION OF COMMITMENT. Any court by which a child or youth has been committed pursuant to the provisions of this section may, upon the application of a parent . . . and while such child or youth is under the guardianship of said commissioner, upon hearing, after reasonable notice to said commissioner . . . upon finding that cause for commitment no longer exists, revoke such commitment, and thereupon such guardianship and all control of said commissioner over such child or youth shall terminate. Any such court may further revoke the commitment of any child or youth upon application by the commissioner or by the child or youth concerned and after reasonable notice to the parties affected upon a finding that such revocation will be for the best interest and welfare of such child or youth. No hearing shall be held for such reopening and termination of commitment or transfer of commitment more often than once in six months, except upon the application of said commissioner."

Balancing all of the evidence presented to it, the Juvenile Court concluded that during the period of separation between the child and her natural mother there had developed between the child and her foster parents a matured parent-child relationship. Recognizing that cause for commitment no longer existed from the time the petition for revocation was brought, the court nevertheless concluded that separation of the child from her foster family at that time would be contrary to her best interests, and consequently denied the plaintiff's petition for revocation. At the time this appeal was brought to the Superior Court, the standard of review to be applied by the Superior Court was set out in General Statutes § 17-70 (b):[9] "The superior court upon such appeal shall review the record . . . of the proceedings of the juvenile court and determine whether or not the court has found facts without evidence or has reached conclusions which cannot be reasonably derived from the facts found or the law applicable thereto or both, or has acted illegally or arbitrarily." Reviewing the record of the Juvenile Court, and applying that statutory standard to the petition for revocation, the Superior Court found that there was sufficient evidence to support the facts found, that the conclusions reached were reasonably derived from the applicable facts, and that the Juvenile Court did not act illegally or arbitrarily. We agree.

The language of § 17-62 (f) is permissive rather than mandatory, counseling that a court *"may,* upon

---

[9] The comparable section is now § 46b-142 (b). Note, however, that since the merger of the Juvenile Court into the Superior Court, an appeal from the Juvenile Division of the Superior Court is now taken directly to the Supreme Court, thus eliminating the intermediate step that in this case took one year and eight months.

the application of a parent . . . upon finding that cause for commitment no longer exists, revoke such commitment." (Emphasis added.)[10] We have held that "may" in the statute is not to be construed to mean "shall," and thus whether "cause for commitment no longer exists" is not the sole test to be applied. *In re Appeal of Kindis,* 162 Conn. 239, 241–42, 294 A.2d 316 (1972). The statute does not limit the inquiry to the *original* cause for commitment but merely specifies "cause," so that the court upon a revocation petition may consider if *any* cause for commitment still exists. Clearly the burden is upon the person applying for the revocation of commitment to allege and prove that cause for commitment no longer exists. Once that has been established, as in this case, the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests. On this point, when it is a natural parent who has moved to revoke commitment, the state must prove that it would *not* be in the best interests of the child to be returned to his or her natural parent. While it is certainly true, as we have held, that parents have no natural right to the custody of their children that can prevail over a disposition effecting the child's best interests; *In re Appeal of Kindis,* supra, 243; *In re Appeal of Dattilo,* 136 Conn. 488, 495–96, 72 A.2d 50 (1950); parents are entitled to the presumption, absent a continuing cause for commitment, that revocation will be in the child's best interests unless

---

[10] The statute additionally provides that a court may revoke commitment upon a finding that such revocation will serve the child's best interests, regardless of whether some cause for commitment still exists. This provision applies only to an application for revocation by the commissioner of children and youth services or by the child; it does not apply to an application by a parent.

the state can prove otherwise.[11]   See *Claffey* v. *Claffey,* 135 Conn. 374, 377, 64 A.2d 540 (1949).

The public policy of this state is *"to strengthen the family* and to make the home safe for children *by enhancing the parental capacity for good child care;* [and] to provide a temporary or permanent nurturing and safe environment for children *when necessary."* General Statutes § 17-38a (a). (Emphasis added.)   Obviously, it sometimes becomes necessary for persons of limited means with few alternatives, when confronted with temporary emergencies such as illness, to look to the state for assistance in providing care for their children.   The United States Supreme Court has recognized that this is a primary characteristic and benefit of foster care. "Most foster care placements are voluntary.   They occur when physical or mental illness, economic problems, or other family crises make it impossible for natural parents . . . to provide a stable home life for their children for some limited period." *Smith* v. *Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 824, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1976).   Certainly such reliance on child care benefits offered by the state during times of crisis is altogether appropriate.   The goals of strengthening the family and enhancing long-term parental capacity for child care despite temporary difficulties would be seriously undermined if parents in need of help could not safely entrust their children, even for short emergencies, to someone who

---

[11] "Except where a nonparent has obtained legal and permanent custody of a child by adoption, guardianship, or otherwise, he who would take or withhold a child from mother or father must sustain the burden of establishing that . . . the child's welfare compels awarding its custody to the nonparent." *Matter of Spence-Chapin Adoption Service* v. *Polk,* 29 N.Y.2d 196, 203, 274 N.E.2d 431 (1971).

could give them better interim care. Such temporary arrangements under circumstances of extraordinary need should not put parents in the position of risking permanent loss of their children due to the intervention of the state. While we do not impugn the motivation of the DCYS, we must equally recognize the legitimacy of the motivation of parents confronted by extraordinary circumstances. "To the ordinary fears in placing a child in foster care should not be added the concern that the better the foster care custodians the greater the risk that they will assert, out of love and affection grown too deep, an inchoate right to adopt." *Matter of Spence-Chapin Adoption Service* v. *Polk,* 29 N.Y.2d 196, 205, 274 N.E.2d 431 (1971).

While the rights of parents qua parents to the custody of their children is an important principle that has constitutional dimensions; *Matter of Bennett* v. *Jeffreys,* 40 N.Y.2d 543, 546, 356 N.E.2d 277 (1976); see *Caban* v. *Mohammed,* 441 U.S. 380, 414, 99 S. Ct. 1760, 60 L. Ed. 2d 297, (1979) (Stevens, J., dissenting); we recognize that even parental rights are not absolute. We must reject the claim of the so-called "parental rights" theory under which "the parent has rights superior to all others except when he is proved unfit." H. Clark, Law of Domestic Relations § 17.5, p. 591 (1968). If, for example, there has been an unusually protracted period of separation between parent and child, even a fit parent may possibly be found to have contributed to or acquiesced in a situation in which custody must be yielded to another. The parent's loss of custody should not however be premised solely on "tangible material benefits to the child at the expense of the intangible, non-material advantages which a parent's care can provide even when

the parent has only limited financial resources." Id., 592. Rather, we must "continue to be guided by what is best for the child's welfare, but . . . place the advantages of a parent's care high in the scale of factors conducive to that welfare. In any controversy between a parent and a stranger[12] the parent as such should have a strong initial advantage, to be lost only where it is shown that the child's welfare plainly requires custody to be placed in the stranger." Id. See *Matter of Bennett* v. *Jeffreys*, supra, 548–49.

In construing a statute such as § 17-62 (f) in the delicate realm of parent-child relationships, "courts should prefer that construction which minimizes state intervention. . . . '[T]he limitations of law often go unacknowledged in discussions about child placement. Too frequently there is attributed to law and its agents a magical power—a power to do what is far beyond its means. . . . The law, so far as specific individual relationships are concerned, is a relatively crude instrument. . . . The law, then, ought to and generally does prefer the private ordering of interpersonal relationships over state intrusions on them.' Goldstein, Freud & Solnit, [Beyond the Best Interests of the Child (1973)], p. 49." *Welfare Commissioner* v. *Anonymous (1976–10)*, 33 Conn. Sup. 100, 103–104, 364 A.2d 250 (1976). This preference for nonintrusion lends weight to our conclusion that when a parent seeking revocation has met the burden of proving that cause for commitment no longer exists, it becomes incumbent upon the state to prove that revocation would not be in the child's best interests.

---

[12] As used by Clark, the term "stranger" means anyone not a parent. It may include relatives, friends, or child care agencies. H. Clark, Law of Domestic Relations § 17.5, p. 591 n.1 (1968).

We must, then, examine whether the state has met its burden in this case of proving that return of the child to her natural mother would not be in the child's best interests. This precise issue is a matter of first impression in this state, as this is the first Connecticut case in which a natural parent has been denied revocation of commitment despite the fact that all parties are agreed that cause for commitment no longer exists. In *In re Appeal of Kindis,* 162 Conn. 239, 294 A.2d 316 (1972), although the court discussed and applied the best interests test, it agreed with the express finding of the Juvenile Court that "cause for commitment of these children *still exists.*" (Emphasis added.) Id., 244. In *In re Appeal of Dattilo,* 136 Conn. 488, 72 A.2d 50 (1950), likewise, the court found that neither the children's mother nor her new husband was qualified to supervise adolescent children; id., 495; and the refusal to revoke commitment was consequently upheld. In the present case no such continued infirmity in the plaintiff's ability or circumstances is alleged.

The crucial issue in determining whether the state has met its burden of proof is whether it has shown that a shift in custody back to the mother will be detrimental to the child. The factors to be considered in making this assessment include: (1) the length of her stay with her foster parents; (2) the nature of her relationship to her foster parents; (3) the degree of contact maintained with the natural parent; and (4) the nature of her relationship to her natural parent. See H. Clark, Law of Domestic Relations § 17.5, p. 594 (1968). In opposing the plaintiff's petition for revocation, the state presented the testimony of a psychiatrist and a psychologist from the Child Guidance Clinic, the

child's school teacher, her DCYS caseworker, and, by deposition, her foster mother. The Juvenile Court was, of course, free to judge the credibility of the witnesses.

The concrete evidence before the Juvenile Court about the parent-child relationship is as follows. At the time the Juvenile Court hearings concluded, the child had been living with her foster family full time for one year and nine months. While it is regrettable that, for whatever reason, the process of determining the advisability of returning the child to her mother could not have proceeded more expeditiously, the court was bound to consider the child's *present* best interests and not what would have been in her best interests at some previous time.[13] The frequency of contact maintained between child and mother is in some dispute. The plaintiff testified that from the time of her release from the Maine hospital she maintained contact through daily letters and telephone calls several times per week. Mrs. M., in her deposition, agreed that there

---

[13] Computing the period of time the child has remained with foster parents can be problematical. "Does it end at the time the natural parent first tries to reclaim the child? Or does it continue until the final decision in the litigation? The difference may be a matter of years. So far as the child's welfare goes, the later time is the relevant one. But this encourages [resistance to] the natural parent's demands, since the longer the decision can be postponed the more likely it is that the foster parent's claim will be vindicated." H. Clark, Law of Domestic Relations, § 18.5, pp. 635–36 (1968).

It is noteworthy that the psychiatrist who recommended rejection of the plaintiff's petition for revocation and approval of the defendant's petition for termination of her parental rights also testified that, had he been consulted earlier, he would strongly have advised that the child be returned to her natural mother as soon as possible. At the time the plaintiff was certified by the Maine social worker to be capable of regaining custody of her child, the separation had been for a period of only six months.

were many letters but averred that only "a few" phone calls were made. It is nevertheless clear that at least some contact was maintained through telephone calls and letters. The DCYS, however, emphasizes the lack of in-person visitation, pointing out that during the year between the plaintiff's illness and the institution of regular visitation in September, 1976, there was a complete absence of maternal visitation with the exception of a few visits during one week in April. Even allowing, as the plaintiff claims, that she felt unsure if visits would be allowed or if she would be a welcome guest in the homes of her husband's relatives, the state points out that greater efforts could have been made to resolve such questions. Certainly such a long absence, for whatever reason, is significant in the life of a young child.

There was also some psychological evidence concerning the parent-child relationship which, although inherently less concrete, is entitled to be given appropriate weight by the trier of fact. The Child Guidance Clinic psychiatrist saw the child twice in September of 1976, once for 45 minutes and once for 20 minutes. Soon thereafter he interviewed Mrs. M. for a half hour and saw the plaintiff for about 45 minutes. On the basis of the various interviews and other information he had been given in a DCYS case report, he concluded that the child suffered from some emotional problems possibly caused by insecurity and doubts about her family status and identification. He also concluded that Mrs. M. was the child's "psychological mother," as that term has come to be understood; see Goldstein, Freud & Solnit, Beyond the Best Interests of the Child (1973); that the child preferred to stay with Mrs. M., and that it would be in her best interests to be allowed to do so. The doctor also testified, however,

that the child knew exactly who her real parents were, and referred to her foster parents as her "fake mommy" and "fake daddy."

In assessing the testimony of the psychiatrist, certain additional factors may be noted. First, he never met Mr. M. or any of the M. children, nor did he ever see the child interact with her natural mother. Second, his testimony revealed that at the time of his examinations, the doctor was under some erroneous impressions from information he had received from outside sources, including: that the child had been living *most of her life* with Mrs. M. (in fact Mrs. M. had been only her day-time babysitter until the age of three and a half); that she had been removed from her family because her father abused her (there is no evidence in the record of any abuse —the child was removed from her family, as indicated, because of her mother's illness); and that he had received a very negative social history of the plaintiff. He admitted that such outside input into his evaluation *probably* has an effect on his decisions. Third, he testified that in a case such as this, the future is very difficult to predict, and that it is possible the child could successfully make a transition back to her mother's custody.

A psychologist from the Child Guidance Clinic also recommended that the child should stay with her foster parents and not be returned to her natural mother. This recommendation resulted from an evaluation of the child lasting six hours over two days. She found "clear evidence of emotional disturbance" related, in her opinion, to disruptions in the child's life and the "continual threats" of having her security shattered in some way. She concluded that Mrs. M. was the child's "psychological mother,"

although the child had told her she also loved her natural mother. At no time did the psychologist meet with either the plaintiff or Mrs. M.

Psychological testimony from professionals is rightly accorded great weight. It seems clear that the child did indeed suffer from emotional disturbances and did manifest some behavioral problems such as boisterous behavior, aggressiveness, sleep disturbances, and cruelty to animals. The Juvenile Court might reasonably have concluded that uncertainty resulting from her custody situation could have caused or aggravated the problems, although there was evidence that would cast doubt on any direct relationship between this undesirable behavior and the resumption of intensive visitation by the plaintiff in September, 1976. The evidence indicates that the behavioral problems arose *before* that time, and that although the professional evaluation occurred during September and October of 1976, the initial appointment for evaluation was made before the plaintiff's frequent visits began. In fact the Juvenile Court's memorandum of decision indicates that behavioral changes began in *June,* 1976, well before the plaintiff returned to Connecticut to resume regular visitation. On these facts it is as possible that any behavioral problems had their roots in the home situation with the foster family as that they were caused solely by the mother's visits. Incidents of cruelty to animals, for example, took place solely in the foster family's household, and never when the child was with her mother.

Although neither the Juvenile Court nor the Superior Court spoke expressly in terms of placing on the state the burden of proving that revocation of commitment would not be in the child's best inter-

ests, we cannot say in view of all the evidence that the findings and conclusions of either court are inconsistent with a finding that the state in fact met that burden. Even allowing that some doubt may be cast on some of the testimony by factual inconsistencies and the limited opportunity of certain witnesses to view the child in her foster home situation or interacting with her natural mother, we are not in a position to second-guess the opinions of witnesses, professional or otherwise, nor the observations and conclusions of the Juvenile Court when they are based on reliable evidence. There was ample evidence from which the court could have concluded that despite the absence of a continuing cause for commitment, the state had demonstrated that because of the length of the separation between mother and child, for whatever reason, and the intervening relationship that had developed between the child and her foster family, it would not at that time have been in the child's best interests to return to the custody of her mother. In the denial of the plaintiff's motion for revocation of commitment, there was no error.

## II

The petition to terminate the plaintiff's parental rights was brought by the defendant commissioner of children and youth services pursuant to General Statutes § 17-43a.[14] With respect to the plaintiff,

[14] "[General Statutes] Sec. 17-43a. TERMINATION OF PARENTAL RIGHTS OF CHILD COMMITTED TO COMMISSIONER. (a) In respect to any child committed to the commissioner of children and youth services . . . the commissioner . . . may petition the court for the termination of parental rights with reference to such child . . . . The juvenile court upon hearing and notice . . . may grant such petition upon finding that over an extended period of time, which, except as hereinafter provided in this subsection, shall not be less than one year . . . (4) there is no ongoing parent-child relationship, which

the petition alleged, quoting the statutory language, that there was "no ongoing parent-child relationship" and that "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." This "no-fault" statutory ground for termination was added to § 17-43a in 1974 by 1974 Public Acts, No. 74-164, § 3.[15] Prior versions of § 17-43a had provided for termination of parental rights, absent consent of the parents, only upon such so-called "fault" grounds as abandonment, neglect, unfitness, or continuing physical or mental disability.

The legislative history of § 3 of Public Act No. 74-164 is sparse. The sole reference to the new ground for termination of parental rights occurs in the remarks of Probate Judge Glenn Knierem, head of the committee of probate judges and clerks, and a representative of the then Welfare Department, which drafted Public Act No. 74-164. Judge Knierem pointed out that "[t]he same basic factors

means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."

The statute alternately provides for termination of parental rights if the parents consent, if the parents have abandoned the child, if the parents have failed to achieve a degree of personal rehabilitation that would allow them to assume a responsible position in their child's life, or if the parents, because of continuing physical or mental deficiency will be unable to provide the child with necessary care, guidance, and control. None of these alternate grounds has been alleged against the plaintiff, and therfore none is at issue in this case.

[15] A major revision of the Connecticut laws concerning adoption was effected by 1973 Public Acts, No. 73-156, but the current "no ongoing parent-child relationship" ground for termination of parental rights did not appear until 1974, in Public Act No. 74-164, an act designed to remedy the "technical difficulties and oversights" of Public Act No. 73-156. See Hearings before Joint Standing Committee on Judiciary, 1974 Sess., p. 194.

which must be used in deciding whether or not to terminate parental rights as were provided in [Public Act No.] 73-156 have been retained in the proposed act. However, one additional factor has been added. This allows the judge to terminate parental rights if he believes that no parent-child relationship exists and [that] to allow time to develop such a relationship would be detrimental to the child. The social scientists tell us that the *first year* of a child's life is most important. Therefore, this standard would allow the judge to decide *in advance* if the parent would be unable to provide the type of relationship necessary for the emotional wellbeing of the child." (Emphasis added.) Hearings before Joint Standing Committee on Judiciary, 1974 Sess., p. 195; see also 17 H.R. Proc., 1974 Sess., Pt. 7, p. 3324.

It is reasonable to read the language of "no ongoing parent-child relationship" to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced. In either case the ultimate question is whether the child has no present memories or feelings for the natural parent. The evidence presented before the Juvenile Court in this case did not meet this test, for it unquestionably showed the existence of an ongoing parent-child relationship between the plaintiff and her daughter. While the evidence may demonstrate that the relationship was a troubled and confused one that had been adversely affected by the separation from the natural mother and by the intervening formation of a new relationship between the child and her foster parents, the rela-

tionship had by no means ended. The statute does not authorize the termination of parental rights upon a showing of a troubled relationship, but only upon a showing of *no* relationship.

The termination of parental rights is defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . ." General Statutes § 45-61b (g). It is "a most serious and sensitive judicial action." *Anonymous* v. *Norton,* 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975). "Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' *Stanley* v. *Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551; see *In re Appeal of Kindis,* 162 Conn. 239, 240, 294 A.2d 316; *Cinque* v. *Boyd,* [99 Conn. 70, 82, 121 A. 678]." *Anonymous* v. *Norton,* supra, 425. See *Alsager* v. *District Court of Polk County, Iowa,* 406 F. Sup. 10, 22–24 (S.D. Iowa 1975), affirmed, 545 F.2d 1137 (8th Cir. 1976).

Section 17-43a carefully sets out and delimits four situations that, in the judgment of the legislature, constitute "countervailing interests" sufficiently powerful to justify the termination of parental rights in the absence of consent. The commissioner of children and youth services, in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and

in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun. No all-encompassing "best interests" standard vitiates the requirement of compliance with the statutory criteria. See *Alsager* v. *District Court of Polk County, Iowa,* supra; *In re Adoption of Children by D.,* 61 N.J. 89, 293 A.2d 171 (1972); *Malpass* v. *Morgan,* 213 Va. 393, 192 S.E.2d 794 (1972); Ketcham & Babcock, "Statutory Standards for the Involuntary Termination of Parental Rights," 29 Rutgers L. Rev. 530, 539 (1976); comment, "Termination of Parental Rights in Adoption Cases: Focusing on the Child," 14 J. Fam. L. 547, 550 (1975).

Insistence upon strict compliance with the statutory criteria before termination of parental rights and subsequent adoption proceedings can occur is not inconsistent with concern for the best interests of the child. Rather, it enhances the child's best interests by promoting autonomous families and by reducing the dangers of arbitrary and biased decisions amounting to state intrusion disguised under the rubric of the child's "best interests." See Wald, "State Intervention on Behalf of 'Neglected' Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights," 28 Stan. L. Rev. 623, 638–39 (1976). Petitions for termination of parental rights are particularly vulnerable to the risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's natural parents with those of prospective adoptive parents and therefore to reach a result based on such comparisons rather than on the statu-

tory criteria. The United States Supreme Court has forcefully recognized this danger: "Commentators have . . . noted . . . that middle- and upper-income families who need temporary care services for their children have the resources to purchase private care. . . . The poor have little choice but to submit to state-supervised child care when family crises strike. . . . Studies also suggest that social workers of middle-class backgrounds, perhaps unconsciously, incline to favor continued placement in foster care with a generally higher-status family rather than return the child to his natural family, thus reflecting a bias that treats the natural parents' poverty and lifestyle as prejudicial to the best interests of the child. [Citations omitted.] This accounts, it has been said, for the hostility of agencies to the efforts of natural parents to obtain the return of their children." *Smith* v. *Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 834–35, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977).

It is thus essential, in considering a petition to terminate parental rights, to sever completely the issues of whether termination is statutorily warranted and whether a proposed adoption is desirable. Although petitions for termination are presumably seldom brought unless prospective adoptive parents are available, there still must be a two-step process to determine, first, the threshold question of whether cause for termination under § 17-43a has been proved. "The best interests of the child, as such, is not an ingredient of [grounds for termination] and is not involved in this threshold question." *Matter of Corey L.* v. *Martin L.*, 45 N.Y.2d 383, 391, 380 N.E.2d 266 (1978); see *Caban* v. *Mohammed*, 441 U.S. 380, 387, 99 S. Ct. 1760, 60 L. Ed. 2d 297, (1979); *In re Adoption of Children by D.*, supra.

Only if a ground for termination exists may the suitability and circumstances of adoptive parents, in an appropriate proceeding, be considered.

In this case, the ground for termination alleged in the petition seeking termination of the plaintiff's parental rights has not heretofore been interpreted by this court. Previous cases upholding the termination of parental rights were brought on different grounds. See *Anonymous* v. *Norton,* 168 Conn. 421, 362 A.2d 532 (1975) (parents unable by reason of "continuing physical or mental condition" to render necessary care); *In re Nunez,* 165 Conn. 435, 334 A.2d 898 (1973) (father had abandoned children and mother was disabled by a continuing mental condition). The evidence presented by the commissioner in support of his petition clearly failed to satisfy the statutory requirement of establishing the absence of an ongoing parent-child relationship between the plaintiff and her daughter. At most, the evidence reveals a relationship in a state of some disrepair. Unquestionably, for the first three and one half years of her daughter's life, a normal parent-child relationship had developed, as a result of the plaintiff "having met on a day to day basis the physical, emotional, moral and educational needs" of her child. Section 17-43a (a) (4). The fact that the child was cared for by a babysitter while her mother worked in no way detracted from the parent-child relationship. At the Juvenile Court hearing, the psychiatrist and psychologist who recommended termination of parental rights had *never* seen the plaintiff and her daughter interact. The psychologist never even met the plaintiff, but did admit that the child claimed still to love her mother. The social worker who frequently saw the plaintiff and her child interact agreed that the child enjoyed her visits with her

mother. All of the plaintiff's witnesses, relatives who frequently saw the plaintiff and her daughter interact, testified that the child clearly knew her mother, and usually enjoyed their visits. The fact that the child may have established a loving relationship with someone besides her mother does not prove the absence of a mother-daughter relationship. It is insufficient to prove that the child has developed emotional ties with another person. Certainly children from two-parent homes may have two "psychological parents"; even children whose parents are divorced may retain close emotional ties to both, although the relationship to one is maintained solely through visitation.

From all of the evidence, and recognizing that "there have been various temporary expressions of feeling on the child's part," the Juvenile Court nevertheless concluded "that there exists no *meaningful* relationship today between Jane Doe and her natural mother." (Emphasis added.) The statute, however, quite clearly does not authorize termination upon a showing of no meaningful relationship, but rather requires that there be *no* relationship. The Juvenile Court was therefore in error in granting the petition to terminate the plaintiff's parental rights, in the absence of statutory grounds therefor.

The Superior Court in dismissing the appeal from Juvenile Court characterized the decision of the Juvenile Court as holding that "it was in the best interest of said child that the petition for termination of parental rights be granted." The "best interests" standard, however, comes into play only if it has been determined that no ongoing parent-child relationship exists, in order to decide whether allowance of *further* time for the establishment or rees-

tablishment of the relationship would be contrary to the child's best interests. The Superior Court thus erred in upholding the granting of the petition for termination. In view of our resolution of the termination issue, it is unnecessary to address the plaintiff's claim that § 17-43a is unconstitutional as a violation of the due process clauses of the federal and state constitutions.

Finally, the plaintiff claims error in the denial by the Juvenile Division of the Superior Court of her August, 1978 motion for immediate visitation pending appeal. While it is unfortunate, given our resolution of this case, that some contact between mother and child was not allowed pending the outcome of this appeal, we cannot say that in denying that motion the court abused its discretion. It has now been slightly over two years since the plaintiff's visitation rights were terminated by the DCYS, and they must now, of course, be immediately reinstated. It is difficult to know what changes these two years have wrought. We expect the DCYS now to marshal whatever resources are appropriate in order to assist the plaintiff in rebuilding and solidifying her relationship with her daughter. We express no opinion, of course, as to the possible outcome of such efforts.[16]

There is error in part; the judgment dismissing the plaintiff's appeal from the Juvenile Court order denying her petition to revoke commitment is affirmed; the judgment dismissing the plaintiff's appeal from the Juvenile Court order granting the petition of the commissioner of children and youth

---

[16] As we have noted, "No hearing shall be held for . . . reopening and termination of commitment or transfer of commitment more often than once in six months, except upon the application of [the] commissioner." General Statutes § 46b-129 (f).

services to terminate parental rights is set aside and the case is remanded for proceedings consistent with this opinion.

In this opinion the other judges concurred.