[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
NATURE OF PROCEEDINGS:
By way of background, on January 20, 1990, the Department of Children and Youth Services (DCYS) filed a co-terminous petition pursuant to Conn. General Statutes Sec. 17-43a (now 17a-112) to terminate the parental rights of Mary K. and Craig Z., Sr., of their 2 1/2 year old minor child, Craig Z., Jr. A trial on that petition was held before Judge Cocco in Norwalk Juvenile Court on May 4, 1989, then continued to June 29, 1989, and completed on August 18, 1989. On May 4, 1989, the Court accepted the mother's voluntary consent to terminate her rights; however, that consent did not diminish the parental rights of the father.
In his memorandum of decision dated February 19, 1990, the Court found that the child had been uncared for by a fair preponderance of the evidence and committed him to the custody of DCYS for eighteen months. He denied the termination of the parental rights of this father, because he did not CT Page 5149 find that any one of the alleged grounds had existed over an extended period of time and proved by clear and convincing evidence as mandated by Sec. 17a-112 (b), C.G.S. He also granted the father limited supervised rights of visitation. In its decision, the Court pointed out that the child was only four months old when the amended petition was filed, that the father's paternity was not acknowledged during part of the period, and the child's whereabouts was concealed from him. It also stated that DCYS would have the right to refile a termination petition without prejudice.
The eighteen month commitment would give the father the opportunity to rehabilitate himself and to encourage belief that within a reasonable time he could assume a responsible position in the life of this child.
On September 27, 1990, DCYS filed a second petition to terminate this father's parental rights, amended to April 15, 1991. This second filing was approximately twenty-two months afterward, and about fourteen months after the first termination was denied. DCYS has alleged three grounds for termination pursuant to Sec. 17a-112(b) C.G.S. subsections (2), (3), and (4).
1. That the child has been adjudicated neglected and uncared for in a prior proceeding and the parent has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of the child.
2. The child has been denied by reason of act or acts of commission or omission, the care, guidance, or control necessary for his physical, educational, moral, or emotional well-being.
3. There is no ongoing parent-child relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. CT Page 5150
DCYS must prove at least one of these grounds by clear and convincing evidence, which shall have existed over an extended period of time and not less than one year unless waived by the court under subsection (c) of Sec. 17a-112, C.G.S.
Before proceeding on the merits of the allegation, there are some matters that require preliminary discussion.
By statutory definition, termination of parental rights means "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption . . ." Sec. 5a-707(g) C.G.S. It is a most serious and sensitive judicial action. In re Juvenile Appeal (Anonymous) 181 Conn. 683, 640,436 A.2d 290 (1980). "Although that ultimate interference by the State in the parent-child relationship may be required under certain circumstances, the natural rights of parent's in their children `undeniably warrants deference and, absent a powerful countervailing interest, protection.'" In re Juvenile Appeal (Anonymous),177 Conn. 648, 611, 420 A.2d 875 (1979). A petition to terminate parental rights consists of two phases, adjudicatory and dispositive. Practice Book Sections 1049, 1042, 1044. The two phases, however, do not have to be the subjects of separate hearings. One unified trial, such as occurred in this case, is permissible. In re Juvenile Appeal (84-AB), 192 Conn. 254, 259 (1984). Although the procedure of one trial is permitted, the two phases serve distinct purposes.
In the adjudicatory phase, the Court determines the validity of the grounds in the petition and, hence is permitted to events preceding the filing date of the petition, as amended, in this case April 15, 1991.
The dispositive phase is concerned with what action should be taken in the best interest of the child and, as to it, the Court is entitled to extend its consideration to matters occurring until the end of the trial, which in this case, was May 7, 1991. The dispositive phase, of course, cannot furnish a subject for decision unless the CT Page 5151 adjudicatory phase is proven first. In re Juvenile Appeal (Anonymous) Supra, 177 Conn. 673.
FACTS: From the evidence offered at this trial, and from the prior proceeding at which the child was adjudicated uncared for, of which judicial notice is taken, supports the following facts. The child was born on September 12, 1988, at Danbury Hospital, and after the mother signed a voluntary consent. DCYS placed the child with foster parents three days later. The mother had been a patient at Fairfield Hills Hospital for about eight years, met the respondent when he was also a patient there. The child was conceived when she left the hospital without permission, to live with him a short time in Bridgeport. She then returned to Fairfield Hills, and shortly thereafter, had the baby at Danbury Hospital. Eventually, this father agreed to paternity blood tests, and DCYS acknowledged him to be the father in January of 1989, at which time supervised visits with the child were arranged by DCYS.
The father did not appear in court for trial on May 4, 1989, on the co-terminous petition of neglect and termination, because he was an in-patient at Danbury Hospital Mental Health Clinic. On that date, the court ordered psychiatric and psychological evaluations. Dr. Paul R. Kensicki, the psychiatric chief there, treated him for his mental illness from April 19, 1989 to May 31, 1989. His Court-ordered report stated that he suffered from a chronic schizophrenia. This mental illness caused him to have hallucinations, delusions, incoherent speech, and thinking disorders. When asked how this 31-year-old respondent could parent an eight-month-old baby, he said he once babysat for his sister on a few occasions when he was fourteen.
The Court ordered psychological report was filed on June 20, 1989, by Frances Sink, Ph. D., a clinical psychologist at Danbury Hospital. It found him to be unable to focus attention on any problem for any sustained period of time and his reasoning was impoverished.
According to these reports, he has suffered for more than twelve years from this mental illness and has been treated in four different hospitals as CT Page 5152 an in-patient. While he has been consistently diagnosed as having an incurable chronic schizophrenia, it has been controllable, to some degree, with medication. But, he needed and still needs extensive rehabilitative therapy along with medication, when he is not hospitalized. Based on these reports, and other testimony at the first trial, the child was adjudged uncared for, but the petition for termination of parental rights was denied. (See Memorandum of Decision in Case No. 89-005).
During the trial on this second petition held on May 6 and 7, 1991, the following witnesses were called by DCYS to testify — social workers Ann Steers and Melissa L. Murphy, and social work supervisor: Judith Kallen, and Ann E. Quinn, a hearing officer with DCYS; Dr. Joel S. Albert, child psychiatrist; Dr. Rught M. Grant Ph.D., child psychologist; Thomas R. Elliott and Wallace L. Sugden, psychiatric case workers assigned to the respondent by Fairfield Hills Psychiatric Hospital working in joint venture with the Danbury Mental Health Clinic. The respondent testified in his own behalf, but he called no other witnesses.
Adjudicatory Phase: Based on facts and events to April 15, 1991, the date this petition was amended. The Court will consider all the facts and relevant evidence from the date this child was referred to DCYS, August 30, 1988, to April 15, 1991.
In the first ground, DCYS alleged that this child was found neglected or uncared for in a prior proceedings, and this respondent has failed to rehabilitate himself. Sec. 17a-112 (b) C.G.S. The United States Supreme Court has repeatedly held that the interests of parents in their children is a fundamental constitutional right that "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanley v. Illinois, 405 U.S. 645. In re Juvenile Appeal (83-CD),189 Conn. 276 held that "It is both a fundamental right and policy of this State to maintain the integrity of the family. Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody. The public policy of this State is "to strengthen the family and to make the home safe for CT Page 5153 children by enhancing the parental capacity for good child care . . . Sec. 17-38a(a) C.G.S. When a child is committed to DCYS, as in this case, the State has the statutory duty to provide supportive services to enhance rehabilitation of the parent for the possibility of eventual reunification of the family. In accordance with this policy, DCYS established supervised monthly visits for the respondent and the child, prepared a social service agreement, and cooperated with his mental health case workers from Fairfield Hills Psychiatric Hospital and the Danbury Hospital who were treating him for his mental illness. These efforts were to help rehabilitate him. He did receive extensive treatment for his chronic schizophrenia from both Fairfield Hills and Danbury Hospital and continues to receive therapy and medication. By his own testimony, he has been unemployed for many years and is not working at this time. He also receives total disability benefits from Social Security, as well as State Welfare by his own admissions at trial.
His mental illness in itself is not a ground for the termination of his parental rights. Termination is warranted under 17a-112 (b), only when the parent's mental illness manifests itself in conduct demonstrative of an inability to care for the child. The condition is significant as it impacts upon the person's ability to function as a parent and the conduct and relationship it has to the child. In re Nicolina, 9 Conn. App. 598, 607.
At this trial Dr. Joel Albert, a psychiatrist, testified that his schizophrenia is permanent and incurable, and that he is unable to understand what is required to meet the day-to-day needs of the child. (State's Exhibit "A") He confirmed the diagnosis of Dr. Kensicki, the court-ordered psychiatrist, who believed that the child should not be left alone with him. Dr. Ruth Grant, Ph.D., a psychologist with twelve years experience in parent-child relationships, testified that she examined him on December 3, 1990 (State's Exhibit "O") and according to her reports he is marginally functional at that time, and unable to work or care for himself. His mental condition makes it impossible for him to care for this child. He does not understand the day-to-day needs of the child are, nor could he perform them because of his CT Page 5154 mental condition. The testimony of these professionals was unrefuted by the respondent. The psychological testimony of professionals is rightly accorded great weight in termination proceedings. In re Juvenile Appeal (Anonymous), 177 Conn. 648. The testimony of child psychologists may properly be considered whether a parent's mental deficiency interferes with the parenting functions necessary to deal effectively with the child. In re David E., 4 Conn. App. 653 (1985). The Court also finds from their testimony that the child needs a permanent, stable home which this father is unable to provide for nor or in the foreseeable future.
The present DCYS social worker assigned to this case, Ms. Melissa L. Murphy, testified that she arranged monthly supervised visits with this child beginning in April of 1990 through April of 1991. The child did not recognize him on any of these twelve visits. He refused to be photographed with him, and would not go into the room without the foster mother. On the July 24, 1990 visit, he cried for the first forty-five minutes of the one-hour visit.
At the administrative hearing by DCYS held June 25, 1990, Ms. Ann Quinn, a regional supervisor with over twenty years of experience, upheld the DCYS treatment plan of monthly visits, and also ruled that the child could go to Wisconsin with his foster parents because of a job transfer. The agency arranged for the child to be brought from Wisconsin to Stamford for these monthly visits. She also recommended that his parental rights should be terminated as soon as possible.
The respondent testified on his own behalf, but he called no other witnesses. It was obvious to the Court that he is suffering from mental illness. He was extremely agitated as he listened to the experts testify, twitching and rotating his arms and legs; and on one of my rulings he clapped his hands. He was late on both trial days about an hour, and when asked by the Court, his explanation was he overslept and didn't have transportation.
He is not working now and lives in a one-room boarding house. He smiled and laughed during the trial, indicating that he was unable to understand the seriousness of the case. CT Page 5155
His answer on direct examination on how his child was being cared for was disoriented and unresponsive.
 "Yes, I have a clear idea. He seems that when he sees the mother, they're spanking him. And it hurts my feelings when they're spanking him. You know because he gets the love and attention from them, but also give him — they give him a special thing like what was caused by my mother and it gave me a mental illness."
Thomas R. Elliott and Wallace L. Sugden, psychiatric caseworkers, both testified that the respondent had been in a Fairfield Hills — Danbury Hospital rehabilitative program that began soon after he was discharged from Danbury Hospital in June, 1989. This program is designed for those who have failed in prior treatment programs, and have had a long history of hospitalization, and also have not complied previously with medication requirements. At first, he attended group meetings, took his medicine, and even purchased a car. He made improvements in his behavior the first year. But, beginning in November, 1990, to the date of trial, he was not taking his medication, admits to using cocaine and alcohol, and for some four or five days "gets lost" without any explanation. He recently was arrested for possession of drugs and failure to register and insure his automobile. It was also necessary to have his benefits directly deposited to a hospital account because he cannot handle his own finances. His personal hygiene is deteriorating, his clothes are soiled, and he is off his mediation. He cannot care for himself, let alone a child.
This constitutes clear and convincing proof that as the parent of a child "who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding," he has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, . . . [he] could assume a responsible position in the life of the child."
The third ground in the petition alleges that there is no on-going parent-child relationship, CT Page 5156 which would ordinarily develop as a result of a parent having met on a day-to-day basis the physical, emotional, moral, and educational needs of the child. (Sec. 17a-112 (b)(4) C.G.S.).
This ground requires a Court to make two findings of fact, first that no parent-child relationship exists, and second, whether it would be detrimental to the child's best interests to allow time for such a relationship to develop. In re Juvenile Appeal (Anonymous), supra.; In re Juvenile Appeal, 1 Conn. App. 463 (1984).
The child, who is now over two and one-half years old, has never once recognized his father. He refused to be photographed with him and would not see him without his foster parent in the room. There was never any parent-child relationship with this father.
For the second part of the test, the Court must decide whether it would be detrimental to the child's best interest to allow further time for the relationship to develop. Approximately two years has elapsed since the first trial, and twenty-six months from the first petition as amended to this petition. Instead of reforming his life and improving or controlling his mental illness by taking his medication, the fathers' behavior deteriorated even more beginning with the July 24, 1990 visit. He came at the wrong hour and the child cried for forty minutes of this one hour visit, and the respondent was distraught, preoccupied, and nervous and could not interact with the child. In January, 1991, he admitted to his social worker, Ms. Murphy, that he was using crack-cocaine and had been arrested on a drug charge. This deterioration was also testified to by his case workers with Fairfield Hills and Danbury Hospital, Mr. Elliott and Mr. Sugden, to whom he admitted using crack and alcohol. In their opinion, his prognosis for the future was poor. By his own admission, he had no home for the child and has not worked since 1988. The Court finds that no relationship has developed between them over this two-year period, and in fact, this child never knew his father for one to develop. The Court finds by clear and convincing evidence it is not in the child's best interest to allow further time for it to develop. The facts are clear, convincing, and CT Page 5157 unrefuted to support the finding that there has been no ongoing parent-child relationship for over two years and termination of his parental rights is in the best interest of this child. Taken as a whole, the evidence was overwhelming that termination would serve the best interest of this child. In re Theresa S. 196 Conn. 18.
The Court has reviewed the recent decision of In re Jessica, 217 Conn. 459 (February, 1991), and the factual findings there, are clearly distinguishable from this case.
The petitioner has sought termination of parental rights on a second ground that the child had been denied by an act or acts of parental commission or commission, the care, guidance or control necessary for their physical, educational, moral or emotional well-being. Sec. 17a — 112(b) (3) C.G.S. The petitioner relies, in large part, on the facts proven in connection with the prior findings to support this claim.
Admittedly, the game evidence might well form the foundation for termination of parental rights on separate and distinct grounds. In the present case, however, Craig Z., Jr., had been removed to a foster home three days after being born and had never lived with this father. Therefore, there was no showing by clear and convincing evidence that the physical, educational, moral or emotional well being of the child was affected by the established acts of parental omission or commission. Accordingly, this ground for termination was not proven.
DISPOSITION: On facts to the date the trial ended, May 7, 1991.
In the disposition phase of a termination petition, the Court shall consider all the evidence from the date the case was referred to DCYS, August 30, 1988, to when this trial ended May 7, 1991. The father's situation has not changed in the three weeks from the adjudicatory date to the present.
In this phase, the Court is concerned with what action should be taken in the best interest of the child. The Court must determine by clear and convincing evidence that the parental acts or CT Page 5158 deficiencies found in the adjudicatory phase support the conclusion that this respondent parent cannot have or should not exercise, in the best interest of the child, any further parental rights and duties. In re Juvenile Appeal, 192 Conn. 254
(1984).
Since the best interest of the child is paramount here, the availability and suitability of adoptive parents is clearly relevant. In re Juvenile, 181 Conn. 646 (1980).
The mandated social study and treatment plan prepared by DCYS, indicates that during the past thirty-two months the child has developed strong, positive and emotional ties to the foster parents. The foster parents are attentive to his needs and they wish to adopt him, and DCYS has recommended said adoption. The events during the past fourteen months now make it imperative to "terminate parental rights as expeditiously as possible to free this child for adoption into a stable family setting." In re Juvenile (84-AB), 192 Conn. 254
(1984).
But, before termination may be ordered, the Court must also consider the six factors and make written findings as set forth in Sec. 17a-112 (d) C.G.S.
1. DCYS scheduled treatment plan reviews with the respondent father. The agency scheduled twelve visits for him and supervised them. The agency was available when he called and came to the office. He was not prevented from seeing his son.
2. The Court ordered psychological and psychiatric evaluation were compelled with and are on file. The service agreement prepared by DCYS was not compelled with by the respondent.
3. According to the clinical experts, and the mandated social study, the child has no emotional ties to his respondent father and he does not recognize him as his father. He does have a strong, bonded relationship with his foster parents, with whom he has lived since September 15, 1988. He does not know any other family, and they wish to adopt him. CT Page 5159
4. Craig was born on September 12, 1988 and he is now over two-and-a-half years old. He has spent his entire life with the same foster parents, except for his first three days.
5. This father has been unable to adjust his circumstances, conduct or conditions because he has suffered from a chronic schizophrenia for the past fourteen years. This mental illness precludes him from obtaining employment or providing a home for him. The supervised visits with the child during these past fourteen months have not improved his relationship with the child. He still does not recognize him as his father. The respondent has never made any financial contributions for his support.
6. The natural mother consented to the termination of her maternal rights on May 4, 1989. She, nor any other person or agency interfered or prevented him from developing or maintaining a relationship with this child. DCYS provided supervised visits and even had the child brought from Wisconsin to meet with him.
Having considered the foregoing six (6) factors, it is both clear and convincing that Craig Z., Jr.'s best interest will only be served if the respondent father's parental rights are terminated so that he may be placed in the security of adoption without further delay.
Therefore it is ORDERED that the parental rights of the respondent father be and hereby are terminated and it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing said child in adoption. DCYS is required to submit reports to the clerk of this Court within ninety (90) days of the judgment and every six (6) months thereafter until such adoption is finalized.
Entered at Stamford, Connecticut, this 6th day of June, 1991.
PETRONI, J.