# IN RE ANTHONY R.*

SUPERIOR COURT

Memorandum filed September 13, 1990

BLUE, J. This case presents important questions concerning the relationship of the guardianship and revocation provisions of Connecticut's neglect statute, General Statutes § 46b-129 (d) and (g), and the provisions of the Uniform Child Custody Jurisdiction Act, General Statutes § 46b-90 et seq. Working through this statutory maze, the court must determine the course of action that will respect the legal rights of all the parties and advance the best interests of the child.

The case has a sad and tangled history. The parents, Teresa and Robert R., were married on April 3, 1982, in Colorado Springs, Colorado.[1] Their only child;[2]

---

* Thus entitled in accordance with the spirit and intent of General Statutes § 46b-124 and Practice Book § 1058.

[1] The history of the parents' marriage and divorce is taken from the file of *Teresa R.* v. *Robert R.*, District Court El Paso County Colorado, Docket No. 84 DR 1143 transmitted to this court pursuant to General Statutes § 46b-112, and entered into evidence as exhibits.

[2] Teresa R. has a child by a previous marriage who is not involved in this case.

Anthony, was born on September 23, 1982. During the next year and one-half, Robert beat Teresa a number of times, and she legitimately feared for her safety.[3] Teresa left Robert on March 14, 1984, taking Anthony with her. On April 19, 1984, she filed a petition in Colorado for dissolution of the marriage in the El Paso County District Court. On December 12, 1984, that court found that the marriage was irretrievably broken and that Teresa was a fit and proper person to have custody of Anthony. It dissolved the marriage and gave custody of Anthony to Teresa, subject to reasonable visitation by Robert.

The 1984 custody order lasted slightly less than three years. By 1987, Anthony was exhibiting significant behavior problems. Counseling did not prove helpful, and Teresa decided that Robert, who she described as "a little more rigid" and an adult male figure, could better control him. She also had a new position that required long hours and, therefore, she felt unable to devote the necessary time to Anthony. On October 20, 1987, the El Paso County District Court, in an uncontested proceeding, granted custody to Robert with reasonable rights of visitation given to Teresa.

At the beginning of 1988, Robert took Anthony to Texas[4] where they lived for a few months, and then to Connecticut, where they lived with Robert's mother. Unhappily, Robert did not prove to be a kind and gentle guardian. On August 17, 1988, Anthony went to a day camp with handprint marks on his face, saying that his father had hit him. Although the matter was referred to the department of children and youth services (DCYS) and Anthony told a DCYS worker that

---

[3] This finding is based on the credible testimony of Teresa R. before this court.

[4] Anthony's educational file indicates that Robert remarried in Colorado and then separated because his new wife could not cope with Anthony.

his father hit him "a lot," the matter was closed when Robert refused to speak to a DCYS worker, and Anthony subsequently returned to camp "in good shape."

By the beginning of the following school year, however, Anthony, who was now in first grade, had become seriously aggressive and disruptive—kicking and biting his fellow students and turning over chairs and desks.[5] The local board of education was concerned sufficiently to request a psychiatric evaluation. The resulting evaluation by Sanders M. Stern, a psychiatrist, based on an interview on October 22, 1988, is in Anthony's educational file. It notes that Anthony was quite open and friendly during the interview, but became defensive when asked about his family life. He played out a scene where a little boy was bad and his father "slammed him across the room." He said that he could not wait to grow up so that he could move out by himself so that his father would not hit him anymore. Anthony then admitted that his father had hit him with his open hand and his belt when he was being disciplined.

In January, 1989, Robert moved to another location in Connecticut, and Anthony was enrolled in a special education program for socially and emotionally deprived children in the local public schools. Anthony was very bright and likeable but continued to present serious behavior problems. Robert frequently confronted the school system with his strong disagreements over the programs in which Anthony was placed. Anthony continued to show "a preoccupation with themes of violence and physical danger."[6]

---

[5] These facts are taken from Anthony's educational file.

[6] See July 17, 1989 treatment review by Steven Simon, a social worker, in Anthony's educational file.

The violence to which Anthony was periodically subjected in the first seven years of his sad and nomadic life reached its apex in the fall of 1989, when his father inflicted upon him injuries sufficiently serious to require his hospitalization. On a Thursday, a neighbor called DCYS to report that Anthony had a huge bruise on the side of his face. Robert had apparently beaten Anthony the previous Monday, and Anthony had not been allowed to go to school all week.

Several things happened as a direct result of this call. First, a police officer was sent to investigate the incident. The officer noticed the size of the bruises on Anthony's face and took him directly to a hospital. During the ride, Anthony said that his father had done it and that, in addition, his father had hit him several times in the past. He also said that his father would grab him by the neck and shake him until he could not breathe. Anthony's hospital records, which were admitted into evidence as an exhibit for the state, show the left side of his face to be a mass of bruises from the chin to the eye and from the front of the face to the ear. These injuries, which must have healed to some extent over the intervening three day period, were plainly inflicted by more than one violent blow to the head.

About one month later, Robert was arrested by warrant for his assault on Anthony. Subsequently, he entered a plea of guilty to one count of assault in the three degree, in violation of General Statutes § 53a-61, and received a sentence of six months, execution suspended, with two years probation on the conditions that he (1) continue with family therapy and counseling, and (2) cooperate with the facility for children where Anthony then resided.

Anthony resided in the facility as a result of the present neglect proceeding, which was also brought in

response to the assault by Robert. Anthony had been discharged by the hospital the day after he was brought there by the officer. On the day of his discharge *Downey, J.,* entered an order of temporary custody, pursuant to General Statutes § 46b-129 (b) (2), finding that Anthony was in immediate physical danger from his surroundings and that immediate removal from his surroundings was necessary to ensure his safety. Anthony was initially placed in a foster home and then placed in an emergency shelter. Robert entered a plea of nolo contendere to an allegation that Anthony was "neglected" in that he had been "abused." See General Statutes § 46b-120. Anthony was adjudged to be neglected and was committed to DCYS for eighteen months. Anthony was eventually placed in a facility for children.

Shortly thereafter, Robert filed a motion for revocation of commitment.[7] About five months after that, Teresa, who still lives in Colorado but who has retained local counsel,[8] filed her own motion, which not only seeks revocation but also asks that she be appointed guardian. The court heard both motions in a lengthy evidentiary proceeding, participated in not only by both parents but also by DCYS, by Anthony's court-appointed counsel, and by Anthony himself, who spoke with the court in chambers pursuant to General Statutes § 46b-138 and Practice Book §§ 1042 (7) and 1044 (8). As a result of this evidentiary hearing, the court finds the following additional facts concerning the present status of Anthony, Robert and Teresa.

First, the court, like many previous obervers, finds Anthony to be a bright, friendly child, who exhibits no

---

[7] Robert's motion was continued by agreement a number of times while he participated in counseling.

[8] Teresa testified that she did not learn of Anthony's placement for several months since whenever she tried to telephone him at Robert's house, she was told that he was away or was playing.

particular behavioral problems in a brief, one on one setting. It is clear from the testimony of the clinical director of the facility where Anthony lives and from a therapist there who has worked closely with Anthony, that Anthony no longer requires the restrictive setting of the facility and is ready to be discharged. It should not be inferred from this, however, that Anthony is without serious problems. He has continued to engage in aggressive, disruptive behavior at the facility and is only just beginning to understand his feelings of anger. Certainly, his past abuse has taught him to view the world as a fearful place. Part of this problem may also be, however, that Anthony is acting out in order to be removed from the facility. Although he no longer needs residential treatment, whoever next has custody of him should plainly have access to counseling services—both for Anthony himself and for the custodian. Anthony could theoretically be placed in a foster home, but all those who have observed Anthony agree that the disruption this would necessarily entail would do much more harm than good. If at all possible, he should be returned to one of his parents. Anthony told this court directly that while going home to his father would be "OK," he much preferred his mother. This is consistent with statements he has made to others in the past.[9] In light of the serious and repeated physical abuse that his father has inflicted upon him, this preference is readily understandable and entirely legitimate. If at all possible, it should be honored.

Second, Robert is an extremely intelligent, articulate individual who, in his own way, cares for Anthony a

---

[9] The therapist testified that Anthony has sometimes said that he wanted to be with his father and has sometimes said that he wanted to be with his mother. He has basically wanted to go wherever he could go first to get out of the facility. Prior to his placement, Anthony told his DCYS worker on several occasions that he preferred to go to his mother because his father had hit him.

great deal. If it were not for his history of abuse, he would appear to be a fit parent. Unfortunately, in light of the firmly established facts of this case, this is a bit like saying that but for its lack of seaworthiness, the Titanic was a fit passenger ship. Robert has participated in counseling during recent months, some of it mandated by the terms of his probation, and his primary counselor testified that he sees no reason why Anthony cannot safely be returned to Robert's custody. That counselor was, however, unaware of the full extent of the abuse in this sad case. He was under the impression that the 1989 incident resulting in Anthony's hospitalization was an isolated one. Unhappily, it was not. The fact that Robert was less than forthcoming with his therapist about such an important matter leads the court to doubt that Robert has genuinely come to terms with his own feelings of hostility and aggression. Although Robert never acted inappropriately during the hearing in this case, the court could clearly sense strong underlying currents of hostility and anger on his part. Of course, the history of abuse here is the best indicator that a real problem exists. There has not been a satisfactory showing that, as far as Robert is concerned, the original cause for Anthony's commitment no longer exists.[10] Although Anthony appears to have done fairly well on overnight visits with his father from the facility in recent months, long term custody is quite a different matter. Put bluntly, the court is not convinced that Anthony would be physically safe in Robert's long term custody. The history of abuse in the present case indicates that fears for Anthony's safety are entirely legitimate.

Finally, Teresa impressed the court as an intelligent, concerned, and loving parent with none of the hostile and aggressive traits that Robert has all too frequently

---

[10] It must be remembered that the original cause for Anthony's commitment was Robert's abuse, rather than Anthony's special needs.

exhibited and certainly without Robert's documented history of abuse.[11] A home study of Teresa and her boyfriend, with whom she has lived for some time, was done in Colorado by the El Paso county department of social services and was entered into evidence as an exhibit for the state. The study finds that Teresa resides in a large, adequately furnished three bedroom home in a middle class neighborhood and has an adequate income to provide for Anthony's needs. It reports that Teresa has been conscientiously checking into local treatment programs in the event that Anthony turns out to need more structure than Teresa, her boyfriend and the local school system can provide. Teresa credibly testified to this effect as well. It further reports that Teresa has done her best to keep in touch with Anthony and has tried to telephone him every week. Again, Teresa credibly testified to this effect. The study concludes that Teresa "has been very cooperative and seems willing to do anything she can to get her son back." That is the impression of this court as well.

Certain negative aspects of Teresa's application must also be considered. In the first place, she voluntarily gave up custody of Anthony to Robert in 1987. Had Robert proven to be a satisfactory custodian, a return of Anthony to Teresa would not ordinarily be considered. But this, of course, is not the case. Teresa now recognizes, as does the court, that if Anthony is to be in the custody of a nonabusive parent, he must be in her custody. Happily, she is willing to assume this responsibility.

---

[11] Documents contained in Anthony's educational file indicate that Robert has, on past occasions, accused Teresa's boyfriend of abusing Anthony during the time she had custody. These past allegations are, however, one-sided and altogether uncorroborated. Robert has not pressed these allegations before this court, and no evidence has been presented that remotely suggests that they may be true.

In the second place, Teresa has no real experience in parenting Anthony in the last three years. She has made frequent telephone calls and had a lengthy visit with Anthony when she was in Connecticut to testify in the present case, but that, of course, is hardly comparable to caring for him on a long term basis. This disadvantage is exacerbated by Anthony's behavioral problems, which would prove a challenge (although quite possibly a surmountable challenge) even to an experienced parent.

One possible solution to this conundrum would be the placement of Anthony in Teresa's home by DCYS for a period of time under protective supervision. Because Teresa lives out-of-state, however, General Statutes § 46b-129 (d) would require notice to the parents and an administrative hearing (quite possibly subject to a subsequent administrative appeal) "in advance of such placement." The court has no doubt, from its experience with the present case, that any such hearing would be a protracted, contested affair, and that Anthony cannot simply be warehoused while all of this goes on. There is ample, uncontradicted testimony that his continued residence at the facility, with children more disturbed than himself, is not in his best interests and that placing him in an interim foster home would make matters even worse. DCYS itself acknowledges this. Like any child, Anthony needs to be in a permanent home with a loving custodian. If at all possible, this should be a parent. As an English judge has recently stated, "The best person to bring up a child is the natural parent. It matters not whether the parent is wise or foolish, rich or poor, educated or illiterate, provided the child's moral and physical health are not endangered. Public authorities cannot improve on nature." *In re K.D.*, 1 App. Cas. 806, 812 (H.L. 1988) (opinion of Lord Templeman).

For all of these reasons, a decision must be made between the parents, and it must be made now. On the basis of all of the considerations discussed above—Robert's history of abuse, the many studies and reports submitted to the court, the court's observation of both parents, and, not least, Anthony's clear and consistent preference—the court concludes that the proper choice is Teresa.

This decision is plainly in accordance with Connecticut law. General Statutes § 46b-129 (g) permits a revocation of DCYS guardianship "upon finding that cause for commitment no longer exists." "The statute does not limit the inquiry to the *original* cause for commitment but merely specifies 'cause,' so that the court upon a revocation petition may consider if *any* cause for commitment still exists." (Emphasis in original.) *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 659, 420 A.2d 875 (1979). The Connecticut Supreme Court has, moreover, held that in considering a revocation petition, "it is . . . the ultimate welfare of the child which must control the decision of the court." *In re Appeal of Kindis*, 162 Conn. 239, 242, 294 A.2d 316 (1972); accord *In re Appeal of Dattilo*, 136 Conn. 488, 495–96, 72 A.2d 50 (1950). Procedurally, "the burden is upon the person applying for the revocation of commitment to allege and prove that cause for commitment no longer exists. Once that has been established . . . when it is a natural parent who has moved to revoke commitment, the state must prove that it would *not* be in the best interests of the child to be returned to his . . . natural parent." (Emphasis in original.) *In re Juvenile Appeal (Anonymous)*, supra.

In the present case, for the reasons previously stated, the court concludes that, given the fact that Teresa has entered the picture and is willing to assume custody of Anthony, cause for Anthony's commitment no longer

exists. The state has indicated in oral argument that, under the facts of the present case, it does not oppose this conclusion. The state does not contend that it would not be in the best interests of Anthony to be returned to his mother.

Since this is a case where Anthony has been found and adjudged to be neglected, General Statutes § 46b-129 (d) provides that "the court may vest such child's . . . care and personal custody . . . with any person found to be suitable and worthy of such responsibility by the court." For the reasons previously stated, the court finds Teresa to be such a suitable and worthy person.

It remains to be discussed whether these conclusions are in any way precluded by the 1987 Colorado decree granting custody to Robert. The court is of the opinion that they are not. A number of factors must, however, be considered in this analysis.

The initial question is whether the 1987 Colorado decree should be given full faith and credit in this state pursuant to article four, § 1 of the United States constitution.[12] The short answer to this question is in the affirmative. "Although there is a conflict of authority on the question whether full faith and credit must be given to custody decrees rendered by other states . . . it is settled in Connecticut that a custody decree rendered by a sister state is entitled to full faith and credit provided that the court which rendered the decree has jurisdiction." (Citations omitted.) *Miller* v. *Miller*, 158 Conn. 217, 220, 258 A.2d 89, cert. denied, 396 U.S. 940, 90 S. Ct. 374, L. Ed. 2d 241 (1969). There is no contention that the Colorado District Court lacked jurisdiction to render the decree in question.

---

[12] Article four, § 1, of the United States constitution provides in pertinent part that: "Full Faith and Credit shall be given in each State to the Public Acts, Records, and judicial Proceedings of every other State. . . ."

The giving of full faith and credit to the Colorado custody decree, however, marks the beginning rather than the end of the decisional process in this case. "A foreign custody decree can be modified in Connecticut for the same reasons that the decree could be modified in the state wherein it was rendered." Id., 221. It is, consequently, necessary to refer to applicable Colorado law. In doing so, both substantive and procedural questions must be addressed.

Substantively, Colorado Revised Statutes § 14-10-131 (2) (1987) provides that a Colorado court may modify a prior custody decree if it finds "that a change has occurred in the circumstances of the child or his custodian and that modification is necessary to serve the best interests of the child." The statute further provides that the prior custodian is to be retained unless "[t]he child's present environment endangers his physical health or significantly impairs his emotional development and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child." Colo. Rev. Stat. § 14-10-131 (2) (C) (1987). Given the fact that Anthony's custodial father has repeatedly beaten him, the court has no doubt that the substantive standards established by Colorado law for a modification of custody are fully met and that a Colorado court would not hesitate to modify its decree under these circumstances.

Moreover, Colorado's intermediate Court of Appeals has held that, when the parties have stipulated that custody issues are to be determined as part of a dependency and neglect proceeding,[13] the criteria that the court must use are those set forth in Colorado's Children's Code. Colo. Rev. Stat. § 19-1-102 et seq. (1986).

---

[13] While there is no formal stipulation in the present case, both parents have affirmatively invoked the jurisdiction of this court in an attempt to obtain custody of Anthony.

"The focus of a dependency and neglect proceeding is on the best interests of the child, and not on factors listed in § 14-10-131, C.R.S." *People in Interest of R.E.*, 721 P.2d 1233, 1235 (Colo. App. 1986) For the reasons previously discussed, Anthony's best interests plainly mandate a change of custodian.

The question that remains to be determined is the appropriate procedure to be followed. Both Colorado and Connecticut have adopted the Uniform Child Custody Jurisdiction Act (UCCJA); Colo. Rev. Stat. § 14-13-101 et seq. (1987); General Statutes § 46b-90 et seq. The UCCJA was designed, inter alia, to "promote cooperation with the courts of other states to the end that a custody decree is rendered in a state which can best decide the case in the interest of the child." General Statutes § 46b-91 (2). See generally, prefatory note, 9 Uniform Laws Annotated, Pt. I, pp. 116–18 (West 1988). The term "custody decree" includes both "an initial decree and a modification decree." General Statutes § 46b-92 (4). The UCCJA gives a court of this state specific authority to modify a custody decree made by a court of another state if "(1) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with [the UCCJA] . . . and (2) the court of this state has jurisdiction." General Statutes § 46b-104 (a).

Such authorization exists here. The jurisdictional prerequisites, set forth in § 46b-93 (a), are as follows: "The superior court shall have jurisdiction to make a child custody determination by initial or modification decree if: (1) This state (A) is the home state of the child at the time of commencement of the proceeding, or (B) had been the child's home state within six months before the commencement of the proceeding and the

child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state; or (2) it is in the best interest of the child that a court of this state assume jurisdiction because (A) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (B) there is available in this state substantial evidence concerning the child's present or future care, protection, training and personal relationships; or (3) the child is physically present in this state and (A) the child has been abandoned or (B) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or (4) (A) it appears that no other state could have jurisdiction under prerequisites substantially in accordance with subdivisions (2) or (3) of this subsection, or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (B) it is in the best interest of the child that this court assume jurisdiction."

The Colorado courts do not now have jurisdiction to modify the 1987 decree under any of the four prongs of this statute. Paragraphs (1), (3) and (4) are obviously incapable of sustaining Colorado jurisdiction under the circumstances of this case. Paragraph (2) is phrased in somewhat general terms, and its applicability to Colorado is more debatable. The crucial question under paragraph (2) is which forum is in the *child's* best interest. "The interest of the child is served when the forum has optimum access to relevant evidence about the child and family." Comment, 9 Uniform Laws Annotated, Pt. I, p. 145. In the present case, optimum access to such evidence plainly exists not in Colorado, but in Connecticut. Connecti-

cut has clear jurisdiction under paragraphs (1) and (2) of the jurisdictional statute and the nonresidential parent, like the residential parent, has invoked its jurisdiction. Authority to modify the Colorado decree consequently exists under § 46b-104 (a).

Since such authorization exists, the UCCJA requires this court to request of the Colorado court a certified copy of its court record, pleadings, orders and decrees. See General Statutes §§ 46b-104 (b), 46b-111 and 46b-112. This requirement compels the court to "reach out for the help of [the Colorado court] in order to arrive at a fully informed judgment which transcends state lines and considers all claimants, residents and nonresidents, on an equal basis and from the standpoint of the welfare of the child." Prefatory note, 9 Uniform Laws Annotated, Pt. I, p. 118. Pursuant to such a request, the court has received a certified copy of the Colorado record and has given that record full consideration in making its decision.[14]

The only procedural question that remains to be decided is whether the Superior Court for Juvenile Matters may properly consider a UCCJA modification claim as part of the present revocation proceeding or must compel the parties to bring a new action for modification to be heard in the Family Division of the Superior Court. The court is of the opinion that requiring a new proceeding is unnecessary and would not be in the best interests of the child. The UCCJA confers jurisdiction to make a modification decree on "[t]he superior court." At best, the designations between the various divisions of the Superior Court raise problems of venue, which "unlike subject matter jurisdiction, can be waived by the parties." *State* v. *Kelley,* 206 Conn. 323, 332, 537

---

[14] The court has also required Teresa to file an affidavit pursuant to General Statutes § 46b-99 (a).

A.2d 483 (1988). Here, all parties have invoked this court's jurisdiction and all have implored it to resolve the case. Since all relevant evidence is before the court and since further delay will be contrary to Anthony's best interests, the court concludes that its decision is precluded by neither Colorado nor Connecticut law.

For the reasons stated above, Teresa's motion to revoke Anthony's commitment and to appoint herself as guardian is granted. Robert is granted reasonable rights of visitation and is ordered to pay Teresa one dollar per year as child support.[15]

---

[15] Teresa has indicated that she does not oppose these orders.