[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff and defendant married Scranton, Pennsylvania, on November 6, 1965, almost twenty-years years ago. It was the first marriage for each. They have resided continuously in this state for the past twelve months. Neither are recipients of public assistance from the State of Connecticut or of any governmental subdivision.
There is one minor child of the marriage, Nicole, who will be twelve years of age within two weeks, having been on November 3, 1980. Two other children have reached their majority.
On October 2, 1989, the Superior Court granted Dominic Pouch temporary custody of Nicole. On December 11, 1989, the Superior Court accepted a temporary visitation schedule contained in a stipulation offered by the parties. They appear before this court each seeking primary physical custody in a joint custodial relationship.
The decision is a particularly difficult one because the court has been denied the normal and valued assistance of current, impartial expert evaluation.
The Family Relations evaluation and report is flawed. It does not reflect the current status of the competing parents. The report was completed September 14, 1990, more than thirteen months ago, and is based upon conferences that occurred fourteen and more months ago. In these circumstances, where the plaintiff mother is claiming a change in her parenting skills, the court cannot look for guidance to an evaluation as dated as this one.
The problem is represented by the Family Relations counselor's reply to cross examination:
 "I haven't had contact with them (the parents) in a long time — so I don't know if they've learned how to work together."
CT Page 9087
That issue is a critical one, one of many focal issues where partisan witnesses are of little help and the parties' testimony is largely self-serving.
Our Appellate Court, in O'Neill vs. O'Neill, 13 Conn. App. 300 (1988), found a thirteen month old Family Relations Office evaluation to be an invalid basis for a trial court's conclusion. At page 303, it quotes In Re Juvenile Appeal (Anonymous), 177 Conn. 648, 664 (1979):
 "`The court is bound to consider the child present best interests and not what would have been in her best interests at some previous time.' (Emphasis in original.)"
The court rejects the assistance of Family Relations Counselor Sharon Kester with regret. She is a competent, articulate, open minded evaluator whose findings and advice would be of great value to the court. Updated interviews with the primary sources within the past few months would have enabled Counselor Kesten to have brought her observations and recommendations current and would have provided assistance to a court in need. Under the current circumstances, the value of her current work is lost to the court other than as historic information.
Similarly, the defendant mother offered a competent, experienced psychologist whose impartial advice would be particularly helpful to the court. Unfortunately, the good doctor came to the court as counselor to Mrs. Pouch, focused on her welfare, and was necessarily committed to doing his patient no harm. He responded to all questions in a carefully phrased manner that was always intellectually honest and professionally adopt but never fully illuminating. His role limited his utility. Freed of his professional ties to his patient, Dr. Legg would have been a most helpful and welcome aide.
And so the court enters these turbulent waters, guided largely by its own observations and by its own evaluations of the competing parents and their supporting witnesses.
For the most part, the witnesses were cheerleaders for their sponsors, offering little illumination but much in the way of superlatives and endorsements.
Kimberly Piscatelli and Gail Facas were exceptions.
Kimberly Piscatelli is a twenty-three year old daughter of parents who had been close personal friends of Mr. and Mrs. Pouch. Nicole was a junior bridesmaid at Kimberly's recent wedding. Kimberly reported Gloria Pouch's harsh treatment of her adopted son, Edward. CT Page 9088 She reported Gloria's calculated manipulation of Nicole, compelling Nicole to spend additional time with her mother. She concluded with a hearty endorsement of Dominic Pouch's mothering skills. Kimberly she did not appear at anyone's request or suggestion but arrived unexpectedly in the courtroom as a spontaneous volunteer.
Gail Facas, Nicole's fifth grade teacher, called as a witness by Gloria Pouch, spoke warmly of two very concerned parents. She felt that under her father's care, Nicole was sometimes tired in school and would sometimes come to school when she was ill and should have been kept at home. Both issues were major themes for Mrs. Pouch in her custody quest.
Gloria Pouch minimizes her own serious in-patient psychiatric history and here diagnosis of bipolar disorder, manic and mixed personality disorder. Hospitalized in 1987 and 1989, she maintains daily medication.
Gloria Pouch magnifies Nicole's medical issues, in part from her position as an aide to a public school nurse, certified in CPR (cardio-pulminary resuscitation) and Basic First Aid, a role that has somehow led to her being regarded as having medical insights and diagnostic skills. The court was offered no qualified medical testimony of Nicoles physical condition. Gloria Pouch used her diagnoses of Nicole to question Dominic's paternal care, and Gail Facas adopted Gloria's diagnosis and concerns. This court finds Mr. Pouch's general care to be appropriate to Nicole's condition.
Mr. Pouch did admit, under forceful cross examination, that he once sent Nicole to school with some medication tucked away inside her lunchbox. He was further compelled to admit that he now knows his actions were contrary to school regulations. The court took note of his transgression, but found it to be more compassionate than threatening, more innocent than calculating.
Much of Mrs. Pouch's objection to her husband's role as a primary parent centers around her conviction that he cannot appropriately mother a twelve year old, cannot properly deal with enlarging breasts menstruation, the privacy needs of a young lady and other gender issues. The court finds that Mr. Pouch has handled those issues well for the past two years and is likely to continue to do so. He is a father with sensitivity.
The court found Mr. Pouch's instincts during the two years he has exercised his court appointed custodial authority to be warm and caring to Nicole and generous to the plaintiff mother. It seems clear that Nicole is doing increasingly better in school while developing good social styles. Mr. Pouch's generosity in extending additional time with Nicole to his competing wife is a particularly positive parenting trait. Mrs. Pouch seizes upon that openness, and her resultant CT Page 9089 increased time with Nicole, as an argument for awarding her primary custody, thus seeking to hoist Mr. Pouch on his own petard of generosity.
It is important for custodial parents to know that a generous and non-competitive use of custodial powers is not a threat to that continuing custody, but, rather, a confirmation of its wisdom. To do otherwise would be to reward negative and adversarial behaviors.
It does not serve the best interest of this minor child to have her waking hours broken into smaller and smaller units and to have those units divided day to day between the competing parents, merely to satisfy the parents' drive for more custodial connection with Nicole. Nicole's need for stability must supercede her parents' needs for accumulating custodial time.
This is a principle Mr. Pouch might bear in mind as the plaintiff mother campaigns for additional access. There is some concern that Nicole's requests might be in response to emotional entreaties by a needy mother. Keep in mind, Mr. Pouch, that visitation is intended for the benefit of the child, not the parent. The court's decision places you in a position of responsibility for Nicole's welfare. School work and ample rest are priorities.
Regarding fault, the court finds a marginal marriage, a brittle wife and a husband who had an affair. His affair confirmed her essential mistrust. It arose during the seventeenth year of a marriage Mr. Pouch described as being basically unhappy with infrequent bouts of happiness. He testified to marital therapy three years into the marriage, in 1968. The therapy focused on the spouses' conflicts with each other's families, he said, conflict which each agreed continued to this day. The court finds the affair was a symptom of the earlier breakdown of the Pouch marriage.
Having reviewed the evidence and the sworn financial affidavits of each party in the contest of the required considerations set forth in Title 46b, Chapter 815j of the Connecticut General Statutes, a finding shall enter that the marriage has broken down irretrievable, a decree of dissolution shall enter and the following orders shall apply:
1. JOINT CUSTODY
a. Legal custody of the minor child, Nicole, shall be joint.
b. The defendant father shall have primary physical custody.
c. The parties shall consult on all major issues involving the child's care, including health and education, but if they are unable to agree, the defendant father's decision shall be binding. CT Page 9090
2. PARENTAL ACCESS
a. Mother will have access to Nicole:
i. The first, second and fourth weekend of each month from Friday at 4 P.M., or after work, to Sunday at 6 P.M.
ii. Every Wednesday from 4 P.M., or after work, to 6:30 P.M.
iii. Two weeks of uninterrupted vacation during the summer. Father shall have a similar uninterrupted two week period during the summer months. Mother's dates are to be chosen by her, and communicated to father, no less than sixty days in advance.
b. Parents shall alternate Easter Sunday, Memorial Day, Labor Day, Thanksgiving, Christmas Eve, Christmas Day and Nicole's birthday. Father will establish the alternating schedule.
c. This court specifically empowers the parties to vary any portion of the access schedule in any mutually agreeable manner.
d. All communication regarding the access schedule is to be conducted solely between the adults.
3. CHILD SUPPORT
a. In accordance with the Child Support Guidelines, plaintiff mother shall pay defendant husband $46 a week as child support until Nicole's eighteenth birthday.
b. Defendant father shall be entitled to claim Nicole as a dependent for income tax purposes.
c. Plaintiff mother shall execute all the necessary documents to enable father to exercise that entitlement.
4. MEDICAL INSURANCE
a. Defendant father shall maintain medical insurance for the benefit of the minor child.
b. While he remains Nicole's primary physical custodian, defendant father shall pay all unreimbursed medical, dental, eye care, mental health, prescription and other health related costs of Nicole during her minority.
5. LIFE INSURANCE
Defendant father shall maintain $33,000 of declining term insurance on his life naming plaintiff as irrevocable beneficiary CT Page 9091 thereof, as long as alimony is due plaintiff hereunder.
6. ALIMONY
a. Defendant shall pay plaintiff $150 a week as periodic alimony for a period of thirteen years.
b. Defendant's retirement shall constitute a substantial change of circumstances sufficient to support a motion for the modification of alimony payments.
c. Alimony shall terminate upon the death of either party or the remarriage of the plaintiff.
7. 221 BAKER AVENUE EXTENSION, GROTON, CONNECTICUT
a. Plaintiff shall forthwith transfer to defendant by quit claim deed all of her right, title and interest in and to 221 Baker Avenue Extension, Groton, Connecticut, free of any claim thereto by plaintiff.
b. The court finds the Baker Avenue property to have a fair market value of $125,000, as reflected in each party's sworn financial affidavit, a mortgage of $7500, and a sales commission of $7500, resulting in an equity of $110,000. Simultaneously with the transfer of title, defendant shall prepare, sign and record a mortgage deed and not payable to plaintiff in the amount of $55,000, carrying interest at the rate of six percent per annum and containing those mortgage terms traditionally set forth in such a document.
c. Mortgage interest thereon shall be paid by defendant to plaintiff in the amount of $275 per month until the sale of the premises, defendant's remarriage, defendant's ceasing to use the premises as a primary residence, plaintiff's assumption of primary physical custody of Nicole, or the cessation of Nicole's continuous full time education, whichever shall first occur.
d. Upon the happening of any of the conditions listed in 7c, above, defendant shall thereupon immediately begin making monthly payment of $1063.40 for a period of sixty consecutive months, thus amortizing the $55,000 mortgage at six percent interest per annum.
e. Should he elect to do so, defendant is empowered to make any principle payments thereon at any time, and from time to time, without penalty.
f. Upon receipt of the quit claim deed, defendant shall thereafter assume the mortgage, taxes and insurance on said property and save the plaintiff harmless therefrom.
8. AUTOMOBILES CT Page 9092
a. Plaintiff shall have title to the 1986 Volkswagen Jetta.
b. Defendant shall have title to the 1988 Mazda S-5 pickup.
9. OTHER MARITAL ASSETS
a. The court finds the parties have accumulated the following additional marital assets:
$ 13,649 IRA (Fidelity)
$180,000 Savings and Stock Investment Plan
$ 38,998 Pension Plan
$ 1,085 CBT Savings account
$233,732 plus current value of plaintiff's vested pension.
b. After mutually agreeing upon the value of plaintiff's vested pension benefit, the parties will add that pension benefit to the $191,990 subtotal and divide the assets equally by means of Qualified Domestic Relations Orders and/or other appropriate documentation.
c. If the parties are unable reach a mutual agreement, defendant husband shall elect the manner of dividing the assets.
10. DEBTS
Each party shall be responsible for the debts as set forth on their respective sworn financial affidavits and shall hold the other party harmless therefrom.
11. ATTORNEY'S FEES
Each party shall pay their own attorney's fees.
12. APPEAL
The foregoing orders with respect to custody and visitation shall stand and operate as interim orders of the court during the pendency of any appeal.
JOSEPH L. STEINBERG, JUDGE