[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The father petitioned to revoke a commitment to DCYS and later amended his petition and also filed a motion for disposition. The grandparents have petitioned the court for a transfer of guardianship.
This case is essentially a contest for the custody of Jacqueline D., a ten-and-a-half year old child (hereinafter Jackie), between a father and mother (the child's grandparents) and their son (the child's father) with DCYS. The original petitioner has maintained a pro-active stance almost throughout in the corner of the grandparents. The case has almost continuously occupied a number of courts, (including a hearing before an administrative tribunal) for almost eight years. Beginning with the July 25, 1984 petition in this court and the custody petition filed in the Superior Court (Family Matters), Docket No. 82341 consolidated with this case for trial, these proceedings have absorbed countless hours of hearings, meetings, involvement of a large number of lawyers, therapists, counselors, and the like, and from the advantage of hindsight have embraced 75 percent of Jackie's life, and have caused her fear, stress and anxiety, about the uncertainty of her future.
Despite the urgings of the two court-appointed evaluators, Dr. Stern and Dr. Mantell, the child's therapist, the child's attorney and guardian ad litem, the child herself, and this court, the parties have failed to reach an agreement concerning Jackie's custody and the extent of involvement and access with Jackie to be afforded the non-custodial party.
The grandfather, although involved in all prior proceedings and in the psychological and psychiatric CT Page 3512 evaluations, was only made a party in the course of this trial, upon oral motion by attorney for grandmother, and over objections by the father. Grandmother's attorney was ordered to file an appearance on the grandfather's behalf, as there was a unity of interest between grandmother and grandfather.
The virulent animosity between parents and son described in the psychiatric and psychological reports and social studies was palpably evident in the courtroom. The hostile behavior demonstrated by the contestants in failing to place Jackie's best interests above all else, by failing to work out an agreement, and to avoid further litigation corroborated by the testimony of Dr. Blau, have clearly convinced this court that a joint custodial or sharing type relationship requiring ongoing communication and good faith mutual agreements and compromises on the details and specifics of Jackie's day-to-day life is not possible between and among the parties and probably will never be.
They are simply unable to bury the hatchet and perceive that their actions and hostility have led to yet another court proceeding in which their spleens could be vented; this of course, has continued to create uncertainty for Jackie, and stress her, all to her detriment. Accordingly, the court must choose in which home Jackie's best interest lies, and concomitant with that, award sole custody and guardianship so that hopefully this protracted dispute may be laid to rest.
Although all of the parties to this unhappy and largely needless litigation share the responsibility for it, it would serve no useful purpose to attempt to apportion the responsibility among the parties, as the father mainly seeks to do. Suffice it to say, the court has considered all of the evidence before it, and the matters sought to be judicially noticed, in the light of the record.
This chapter in the litigation began with a petition by DCYS for commitment of the child in May 1987, which alleged that the child was neglected. The child was committed by agreement of all parties, who were represented by counsel, on February 25, 1988. That commitment was extended by agreement for two successive periods of eighteen months each with the present commitment due to expire on August 25, 1992.[1] The child's mother has shown little interest in the child since the petition was brought, rarely visited her, and attended only parts of the trial. She has for the most part, abandoned the child; and has no stable home. Although the court finds that she is now in a secure, loving and stable home, the court also finds that the causes for the original commitment still exist CT Page 3513 because a revocation of the commitment would mean a return of the child to her mother's custody. None of the parties or their counsel (even mother's) have or could advocate such a result which would be contrary to the best interest of the child. Therefore, father's amended petition to revoke the commitment is denied.
Turning now to the grandmother's petition for a transfer of guardianship, and the father's motion for disposition, the question that now must be dealt with is in whose custody, the grandparents or the father, does the welfare and best interest of Jackie dictate. In this regard, the court directed the parties to file dispositional plans pursuant to Practice Book Section 1044(7), and all have done so, except mother. DCYS merely reiterated its social study.
As this is a contest between the father on one hand and the grandparents on the other, the presumption contained in Section 46b-56b must be applied.
Section 46b-56b provides:
 In any dispute as to the custody of a minor child involving a parent and a nonparent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to have custody.
In a case involving a custody dispute between DCYS, an unrelated foster parent and the natural mother over a committed child, our Supreme Court said:
 "While the right of parents qua parents to the custody of their children is an important principle that has constitutional dimensions, (citations omitted) we recognize that even parental rights are not absolute. We must reject the claim of the so-called parental rights theory under which the parent has rights superior to all others except when he is proved unfit. (citations omitted). If, for example, there has been an unusually protracted period of separation between parent and child, even a fit parent may possibly be found to have contributed to CT Page 3514 or acquiesced in a situation in which custody must be yielded to another. The parent's loss of custody should not, however, be premised solely on tangible material benefits to the child at the expense of the intangible, non-material advantages which a parent's care can provide even when the parent has only limited financial resources. (citations omitted) Rather, we must continue to be guided by what is best for the child's welfare, but. . .place the advantages of a parent's care high in the scale of factors conducive to that welfare. In any controversy between a parent and a (non-parent), the parent as such should have a strong initial advantage, to be lost only where it is shown that the child's welfare plainly requires custody to be placed in the (non-parent)." In re Juvenile Appeal (Anonymous), 177 Conn. 648, 661-662 (1979). (internal quotation marks omitted.) See also note 12, page 662.
However, it must be borne in mind that a parent has no natural rights to the custody of his child which can prevail over a disposition affecting the child's best interests. In re Kindis, 162 Conn. 239, 243 (1972). The welfare of the child is the controlling consideration and this principle is determinative even at the expense of depriving a parent of custody.
In determining the issue of custody between a parent and nonparent, as here, the Supreme Court has identified at least four factors to be considered: (1) the length of the child's stay with the (nonparents); (2) the nature of her relationship to her (nonparents); (3) the degree of contact with (her father); and (4) the nature of her relationship to her (father). Id., 663.[2]
The court has considered these factors and others and has afforded both the presumption and "strong initial advantage" to the father, but the court also finds that DCYS and the grandparents have met their burden of proof by far more than the fair preponderance of evidence, that it would be detrimental to the child to place her in her father's custody.
The court bases this conclusion on the following findings: CT Page 3515
1. Jackie is a ten-and-a-half-year-old child who is charming, intelligent, well-spoken, and well-behaved; and the court, pursuant to Section 46b-56 (b)r must give consideration to her wishes, as the court finds that she is of sufficient age and maturity and intellectually capable of forming an intelligent preference. Her preference, as consistently stated by her to her therapist, her attorney, and guardian ad litem is to reside with her grandparents. This preference was also stated to this court by the child in an interview pursuant to Connecticut General Statutes Section 46b-138, Practice Book Section 1044, agreed to by all parties, and was disclosed to all counsel. The court has also considered her stated preferences regarding the father's visitation rights, together with the suggestions of the grandparents, the child's guardian ad litem and attorney, and the father.
2. The child has lived with her grandparents for almost five years in a stable, secure and loving environment. She has developed a routine at school, made a circle of friends, engages in wholesome out-of-school activities and is clearly happy and comfortable in this lifestyle. She has her own attractively furnished room in the grandparents' home which has now become her home and she is a part of an extended family. To disrupt this lifestyle now would be detrimental to her and not in her best interests. However this lifestyle originated, and whether the father's interests were trampled upon, as he perceives it, to maintain it, is not relevant to the present best interests of the child, and is beside the point. The court significantly notes that father was represented by counsel throughout and acquiesced or agreed to the original commitment to DCYS and all the extensions thereof. At all of those times, the child had been continuously residing in the home of the grandparents.
The court also notes that father consistently visited with the child and telephoned the child often, but provided little, if any, financial support to her, or for her benefit. Also, the court finds that the child was in the care of the mother continuously for about two-and-a-half years prior to the placement with the grandparents. It appears that in the entire child's life, the father had sole custody for a period of less than one year, a portion of the latter part of 1983 to about July 1984, during his relationship with Joyce DeCormier while living in her home. During this period, and at other times, grandmother assisted in caring for the child, including overnight visits. In sum, the father has not seen to the day-to-day care of Jackie for the past eight years.
3. Dr. Stern in 1989, Dr. Mantell as far back as CT Page 3516 1988, have consistently recommended based on no small part on the father's characteristics, including deficient parenting skills, his emotional makeup, his obsession with this litigation, his anger, and potential for violence, that custody of Jackie be with the grandparents. From the evidence, there have been no substantial changes in the relationships of the various parties that would provide a basis to alter these opinions.
Mrs. Barbara Grover, the child's therapist and counselor, saw Jackie for 94 one-hour sessions between July 1987 and the present. She also met with father several times and saw and spoke with grandmother on many of the occasions when grandmother brought Jackie for the sessions. Mrs. Crover has a bachelor's degree in mathematics and psychology, a Masters' degree in counseling, has interned in clinical therapy at Connecticut Valley Hospital and Bristol Mental Health Center. Since 1985, she has worked in a private practice of counseling of children, individuals and families with Associates for Behaviorial Change. She opined that it would be devastating to the child to remove her from the grandparents' home and place her with her father. Mrs. Grover predicted that the emotional consequences of such a move would be severe, as she "couldn't imagine (Jackie's) ability to function" if she were moved to father's custody.
The court may give great weight to psychological expert testimony in child custody cases. See In re Juvenile Appeal, 177 Conn. 648, 667 (1979). In this case, the court finds that Dr. Mantell's reports and conclusions were detailed, thoughtful and based on perceptive observations, and had a concrete factual basis. The court further notes that Dr. Mantell was extremely deliberate in the process he used by not coming to a conclusion in 1987, but awaited further information and study. He then concluded in early 1988 that Jackie's best interests lie with the grandparents, despite their problems and dysfunctional relationship. He reconfirmed this conclusion on December 31, 1988, and again in February, 1989. Dr. Stern's conclusions were also factually based and logical and so also were Mrs. Grover's. The court finds their conclusions well reasoned and credible. In this regard, it is noteworthy that Dr. McIntyre, a psychologist who treated father for over 40 sessions for several years, although testifying that father was capable of parenting the child, did not opine that father should have custody in preference to the grandparents.
4. The court also specifically finds that the father cannot provide a secure, violence free, nurturing and stable home to Jackie at this time. As the past is the best predictor CT Page 3517 of the future, the court concludes that he will probably be unable to provide such a home in the reasonably foreseeable future. It is abundantly clear that after eight years of only himself to care for, he presently has no home he can call his own.
The court observes that in the past he has had at least two short-term relationships with women which formed a family unit including the child. The first, with Mary D., Jackie's mother, was marked by violence. The second was with Joyce DeCormier, and was also of short duration. The present one with Ms. Adams has lasted for about seven months, but has been punctuated by at least six breakups, each of which caused father to leave the Adams home for varying periods of time. He has established an on again/off again residence with Ms. Adams, at her sufferance, and is dependent upon his relationship with her, which the court finds to be volatile, unpredictable and riven with discord and dissension. His leaving there so frequently cannot, by any stretch of the imagination, allow the Adams home to be considered stable.
5. The court also finds that the father has almost consistently put his own interests and desires for vindication of his "parental" rights and for retribution ahead of Jackie's interests; at the same time, there is no doubt in the court's mind that he genuinely loves her and cares for her. A telling example of his disregard for the child's interest is when he was exercising his rights of visitation and she asked to be taken home in order to attend a friend's birthday party. He deliberately kept her 15 minutes late. Another is when he was hectoring her in the mall. Even Ms. Adams, who testified on father's behalf, thought he was overdoing it. The lightbulb escapade on Route 395 is symptomatic of the father's character, and his propensity to get into confrontations, resulting in untoward consequences. Nor have the 40 plus hours of therapy improved his outlook and behavior. This documented behavior correlates with the findings of the evaluators. Dr. Mantell's report, dated February 7, 1989, states on page 3, "Closeness to others, displaying weakness and a willingness to compromise are seen by father as fatal concessions." Father also has Jackie in fear of him, and the court finds this fear justified in the light of his potential for angry confrontations, demonstrated twice with Ms. Adams (thrown coffee incident, headlight bulb incident) and on the times when he left the Adams home; once in the grandmother's home (orange juice incident), and once with her son, Dwayne, causing him to leave his mother's home against her wishes. Another example is the child's christening which instead of being a happy event for the child became a bitter, unhappy experience. Father has also acted inimically to Jackie's best CT Page 3518 interest — witness the story of the Christmas Eve visitation — most of which was spent in a car, including the opening of gifts in the car. After five minutes in the Adams home, he took Jackie to his place of employment, where they spent the rest of the holiday evening. As Jackie said, it was not a Christmas Eve she wanted. But it was what she got.
The dispositional plan proposed by father indicates his overwhelming desire to exert control over his child, without due regard for her best interests. His proposal to allow open visitation to the grandparents allowing Jackie to "see her grandparents as often as she chose" would obviously require frequent communication and compromise between father and grandparents, which they have been unable to accomplish in the past, despite urgings by all therapists, counsel and others, is clearly unworkable and is out of touch with reality. It would insure the intrusion of continual bickering and discord into the child's life and daily routine. The court also looks askance at father's proposal that he determine whether or not Jackie should continue counseling with her present therapist with whom she has established a trusting, beneficial relationship.
It is significant to note that the plan makes no provision for the transfer or continuation of Jackie's out-of-school activities, although the father testified that a transfer of custody would necessitate a different school, albeit a school which the child previously attended while in kindergarten. In sum, the adoption of the salient points of father's plan would deprive the child of the secure and stable home, activities and relationships she has enjoyed for about five years, indeed, deprive her of the only secure and stable home she has had during the ten-and-a-half years of her life, and plunge her into uncharted territory. This is clearly detrimental to her and not in her best interests.
The home study, which the court finds was frustrated by the father, provides yet another example of the father's inability to admit to the existence of any deficiencies or problems in his ability to effectively parent the child. Instead of conceding to the social worker that he did not presently have a suitable home for the child, the father resorted to evasion and subterfuge. By doing so, he placed his interests ahead of the child's. The court specifically infers that from Christmas Eve 1991 through February 7, 1992, the father had no suitable home to which he could take the child to enjoy their visitation. This is symptomatic of father's unstable and chaotic living situation and is an unsuitable environment to which the child should not be subjected for any appreciable length of time. The court finds Ms. Adams' CT Page 3519 recantation of her statements to Kerry Gross less than credible;[3] and further finds that father's evasions of the home study cast a cloud on his credibility.
6. Although the grandparents' relationship with their son is fraught with animosity and they perhaps have a dysfunctional relationship with each other, they also both love and care for the child and have clearly demonstrated this over the past five years. The convergence of events in 1987 thrust their custodial role upon them, and they initially reluctantly accepted it. The grandmother is found to be the psychological parent of Jackie, and the one to whom Jackie looks to for her every day care and emotional and material support. She has always been there for Jackie and Jackie has a warm, comfortable relationship with her and loves her. These feelings are obviously reciprocated.
Accordingly, the court finds that the grandparents are suitable, fit and worthy persons to have guardianship of Jackie, and further finds that it is in Jackie's welfare and best interest to reside with them in their home where she has her own personalized attractively furnished room, where she is comfortable, and where she can maintain all of the fixed tangible and intangible anchors in her life, her friendships, her school, her out-of-school activities and her extended family relationships. The court, therefore, grants the grandparents' petition and transfers sole guardianship with legal custody to Elizabeth Sylvia and Joseph Sylvia, subject to the following orders:
(1) Father shall have specified rights of visitation: 12:00 noon to 6:00 p. m. every other Sunday; 5:30 p. m. to 8:00 p. m. every other Wednesday during which father can take the child to dinner, help her with homework or conduct some other quality type activity. If Wednesday nights conflict with any previously arranged, regularly scheduled activity of the child, then another evening shall be agreed upon; if no agreement can be reached, then the child's attorney and guardian ad litem shall designate the evening.
Four (4) hours on the child's birthday and from 10:00 a.m. to 6:00 p. m. on Father's Day each year. If the birthday is a school day, from 4:00 p. m. to 8:00 p. m.; if not a school day, from 2:00 p. m. to 6:00 p. m. Every Norwich Sail Festival Day from 3:00 p. m. to 10:00 p. m.
Every Christmas Eve from 3:00 p. m. to 9:00 p. m. The special and holiday visitation shall be in addition to the regular visitation, and shall be combined if they occur on the same day. Father shall also be able to visit on such special CT Page 3520 events that Jackie wishes to invite him to.
Father shall have the rights of access to academic, medical, hospital and other health records of the child pursuant to Section 46b-56 (e). Copies of any such records shall promptly be forwarded by grandparents when and if obtained by them.
Father shall have telephone contact with Jackie two times per week, and unlimited letter/postcard contact.
Neither grandparent shall do anything to frustrate or interfere with father's rights of access, communication and visitation with Jackie. They shall especially use their best efforts not to schedule any non-school activity to interfere with father's weekday evening visitation. The grandparents shall have the right, upon one month's written notice to father to substitute up to four visitation days (but not Father's Day, her birthday or Christmas Eve) for an appropriate purpose (vacations, special events, etc.). This right may be exercised no more than twice in any calendar year.
These orders are entered in the Juvenile Court proceeding and the custody action pending in the Family Relations Session, Superior Court, Docket No. 82341, Judicial District of New London at Norwich, in which grandmother was a party and which was consolidated for hearing in this court. The court makes no order respecting overnight visitation at this time. However, once father has been able to demonstrate his uninterrupted maintenance of a secure, stable, suitable home for a minimum of one year, this issue should be reviewed.
No motions shall be made by either party to modify any of the above orders save in the case of emergency or other extraordinary circumstances, without first seeking informal mediation through the office of Family Relations, Superior Court, and no such motion may be filed without an affidavit stating that such mediation was attempted, and the dates and times of such mediation efforts. This court shall retain jurisdiction of this case, and all further proceedings relating to custody and visitation. See Connecticut General Statutes Section 46b-121; In re Juvenile Appeal (85-BC),195 Conn. 344, 367 (1985).
The grandparents shall see to it that Jackie shall continue in counseling so long as deemed necessary by the therapist. The grandparents shall encourage Jackie to visit with father and grandparents and father shall continue in counseling individually so long as their counselors deem CT Page 3521 necessary. The grandparents and father shall exchange addresses and telephone numbers and keep each other apprised of any address or telephone number changes.
Father's support order of $25 per week is continued, payable to the grandparents. In the event another support order exists, it shall be superceded by this order, provided, if there is any arrearage, he shall pay $10 per week on the arrearage to the person entitled thereto. Both the current support and the arrearage shall be secured by wage execution.
Father shall provide health, medical, dental and major medical insurance for the benefit of Jackie, if available through his employer. Father shall pay one-half of any unreimbursed medical, dental or counseling expenses not reimbursed by such insurance.
A Section 46b-84 (c) order shall enter to be drafted by grandparents' counsel, directed to father's health insurer, so that grandparents may deal directly with the carrier without father's involvement. Father's counsel is directed to provide counsel with the policy number and name and address of the insurer.
In the event the grandparents have a gross annual income in excess of $15,000 for the calendar year 1992, they shall have the IRS exemption for the child in that year and in 1994 (with said proviso) and in alternate years thereafter. The father shall have the IRS exemption for the child in 1993 and for alternate years thereafter provided he is not in arrears of this court's support order. In the event either fails to qualify in the year allotted to them, the other shall have the exemption, so long as he or they shall qualify.
DCYS is accordingly discharged from any further involvement in this case, unless, as seems problematical, new grounds for a neglect/uncared for commitment arise.
In the light of the foregoing, father's motion for disposition is denied.
The court at this time enters no visitation orders with respect to mother anticipating that the grandparents and mother and their counsel can resolve the matter; if not, then they are also referred to mediation in the Family Relations office, Superior Court. In the event of appeal, these orders shall remain in full force and effect.
TELLER, J. CT Page 3522