MEMORANDUM OF DECISION
This case is an action for termination of the parental rights of the respondent initiated by the petitioner in the probate court. The case was transferred from the Probate Court for the District of Meriden upon the motion of the respondent pursuant to General Statutes § 45a-717 (g). The petition alleges the grounds of no on-going parent child relationship. General Statutes § 45a-717 (g)(2)(C). The respondent is the male biological parent of the minor child, Peter. The petitioner is the female biological parent of the minor child. The petitioner and the respondent are the divorced parents of Peter, the child, who was born on August 8, 1988. He will be ten years of age in August. This case finds its genesis in visitation problems.
The court has heard testimony over three days from the petitioner, the respondent, Barbara Berkowitz, a court appointed clinical psychologist, the petitioner's present husband, the respondent's fiance of six years, and a DCF social worker. Numerous documents were placed in evidence including the psychological report of Dr. Berkowitz, photographs, letters, numerous pleadings from dissolution of marriage actions and restraining orders of other courts, financial affidavits and deposition transcripts. The court having carefully considered all of the evidence makes the following findings by clear and convincing evidence. CT Page 1375
Neither the petitioner nor the respondent were completely candid and truthful in their testimony at all times. Each would say whatever seemed to them to advance his or her cause irrespective of objective reality. Both made statements to this court, to the psychologist, to lawyers and to other judges which if not absolutely untrue, were, at the very least, so carefully circumscribed as to be genuinely misleading. If it were not for the matter of the child's interests, the court would dismiss the matter from the docket. The court is faced with the very challenging problem of trying to find a sufficient number of credible splinters to constitute a whole blank of truth. Each party, and their respective counsel, excluding the child's attorney, was eager to tell as many unpleasant things about the other party as they could possibly recall. The resulting factual findings are, consequently, very unpleasant.
I. FACTUAL FINDINGS
The petitioner testified that when she was sixteen her parents separated and she moved to Florida with her mother. While the petitioner was distraught over her parents' separation and moving from Connecticut to Florida, she met and married a young Navy sailor. She maintains that she did not go home with her new husband after the wedding ceremony; she did not consumate the marriage, and a week later, she returned to Connecticut to live with her father. She said she had the marriage annulled.
On cross examination of the petitioner, the respondent eagerly offered into evidence a decree of dissolution of marriage obtained by the petitioner's first husband (Respondent's Exhibit B). The respondent offered this document to prove that the petitioner did not get an annulment as she had testified. The decree showed that the petitioner was married in Florida on June 11, 1982; the writ was brought to the Superior Court on January 11, 1983, and the decree of dissolution of marriage was dated May 12, 1983. The document neither proves an annulment occurred nor that an annulment did not occur. It does prove that the first marriage was very short and of very little consequence to this proceeding.
The Petitioner testified that she was sixteen years old, in the ninth grade and living with her father when she returned from Florida. She soon met the respondent who was twenty-three years of age (seven years her senior), and was living on and off with his first wife. The respondent, later writing about his first CT Page 1376 marriage, reported ". . . I met my first wife. I was very naive when it came to relationships with women. She got pregnant in the short time I knew her and I believed the right thing to do was to marry her. It never crossed my mind that the child might be someone elses . . . I went through "hell" in my first marriage. I had to endure adultery, lies and then the knowledge that Stephanie wasn't even my child. My point of view changed drastically and I became bitter . . ." (Respondent's Exhibit F). This analysis of the respondent's first marriage, as described by the respondent, classically captures a recurrent theme in all of his testimony: he doesn't accept personal responsibility for anything that occurs to him. He blames others. Dr. Berkowitz also noted at some length his "pattern of externalization of responsibility."
The petitioner has her issues as well. She describes the period of living with the respondent as follows. She was sixteen, within three months they "got serious," and, although he was still living with his first wife from time to time, she moved in with him. According to the petitioner, he wouldn't let her finish high school. "If we had been out late, it was difficult to get up. " There were transportation issues and the ever present thought that if she went off to school he might not be there when she got back. She described the same period as physically abusive. "He would slap me, punch me, threw me on the floor, kick me . . . he left me while in a bar . . . he slapped me across the face because he thought I was cheating on him . . . he forced me to have sex and things got worse." The petitioner told Dr. Berkowitz that he only "slapped her around a little" before the marriage. She continued in this relationship for three years before they married.
She describes their marriage in much the same abusive detail. During a pregnancy he grabbed her by the hair until a friend intervened. She reports going to the hospital with two fractured ribs and a black eye. The petitioner said her husband "prospected for the Diablos motorcycle gang" and had a gambling problem. Her testimony on many of these issues was not consistent and seemed somewhat contrived and less than completely sincere. The respondent confirmed some of her testimony however, when he told the child's attorney during an interview that he had hit the petitioner during the marriage because "she wanted to be beat." (Report of Dr. Berkowitz).
The petitioner met her present husband, Bob[2], as a CT Page 1377 neighbor who lived close by to her and the respondent when they were married. She told Dr. Berkowitz that she became friendly with him and romantically involved after she and her husband were separated but prior to the divorce, according to her statement to the psychologist. "He is the father of her second son." This child, the second son, was conceived and born (June, 1991) during the marriage of the petitioner and respondent and while they were living together, notwithstanding her statements to Dr. Berkowitz that she became romantically involved with Bob only after she and her husband separated. The court believes that the petitioner knows which of these two persons is the father of this second child and has feigned a possibility of doubt only when it works to her benefit. This will become more apparent.
The petitioner contacted her present lawyers firm in late fall 1991 to initiate a divorce. Her complaint was brought to the Superior Court on December 17, 1991. At some point during the divorce, the respondent went with the petitioner to her lawyer's office and voluntarily paid some, if not all, the petitioner's legal fees for the dissolution of marriage. The respondent did not obtain an attorney and did not go to court for the final hearing.
At the time of the final hearing on the divorce the petitioner and her counsel requested a finding that there were two children issue of the marriage, Peter and the second child. They asked the family court judge not to award the respondent any visitation with the children. The reason for preventing any visitation whatsoever, was not adequately explained to this court. The petitioner sought and was granted an award of seventy dollars per week per child ($140 per week total), a dollar a year alimony, medical insurance, a change of name to her maiden name, and an order requiring the respondent to "be wholly responsible for the outstanding medical bills as disclosed on the plaintiff's financial affidavit . ." The support order was subject to an immediate wage withholding order. This was a rather bold request of the court when placed in the context of two other then existing scenarios.
The petitioner entered that proceeding in less than good faith. She had been actively sexually involved with Bob, which likely resulted in the conception and birth of her second child[3] while she was still living with the respondent. She and Bob had been abusing cocaine together. Bob had been involved in a substance-related, fatal accident for which he received a CT Page 1378 conviction for manslaughter in the second degree. In May or June of 1991, he was sentenced to ten years in prison, suspended after eighteen months and three years probation.
The second scenario relates to the respondent's situation. He had been previously married before this marriage. He had been divorced before. He had a wife who had a child that probably wasn't his child. According to him his first wife was unfaithful to him. He was ordered to pay child support for that child by his first marriage and was considerably in arrears on that child support[4] and he did not visit with the child of his first marriage, content to blame his first wife for turning the child against him. He did not have a relationship with the child by the first marriage until she was nearly an adult.
When his second wife, the petitioner, sought a second divorce against him, he did not elect to be represented notwithstanding the enormous negative consequences of his first divorce. While he professes to not initially know there was a genuine issue as to his paternity of the second child, immediately following the divorce he hired a lawyer who filed a "Motion for DNA paternity Test."[5] His claim that he didn't know about the questionable paternity seems disingenuous. The scenario of his first divorce was played out again in nearly identical fashion with nearly identical results.
While the dissolution of marriage was granted on July 22, 1992, and no visitation was formally awarded to the respondent, the petitioner did allow visitation "by her grace." If it was entirely convenient to her and the child, the respondent would be allowed to visit on occasion. The petitioner said the respondent only visited twice. The respondent said it was more like once a month. The petitioner said she stopped visitation when he took the four year old child to a keg party at a lake and left him unsupervised, wouldn't tell her where he was living and wouldn't give her a phone number. This visitation, whatever it was, ceased entirely when the petitioner left the area where they had previously lived and moved to the Hartford area.
The petitioner testified she was in counseling and recovery from her drug use, she was going to bible college in Hartford, starting a new life, and attending Narcotics Anonymous and Alcoholics Anonymous as support groups. She said she did not tell the respondent that she had moved. She testified that the respondent had not been visiting, she did not have his address, CT Page 1379 he was living with his girlfriend and that he did not want her to know where he lived. The respondent on his part said he wanted to have visitation but could not locate the petitioner and the child.
The court finds that the petitioner did not want anything to do with the respondent and was in no way eager to let him know where she was. Similarly, the respondent was in a new relationship, was behind on his support payments, had been restrained by court order from contacting the petitioner "except for visitation" and didn't exercise diligent efforts through the Support Enforcement Bureau or friends and relatives to locate her. Both were relatively content with the situation. Except for the issue of money and the second child.
On January 20, 1993, the respondent conferred with an attorney regarding an attempt to modify the no-visitation order and "simultaneously to clarify the paternity matter regarding . . . (name omitted) . . . who was the youngest of the two boys." (p. deposition, Respondent's Exhibit A). Thereafter, on February 24, 1993, the attorney filed a motion for modification of judgment and a "Motion for DNA Paternity Test" in which the respondent sought ". . a DNA paternity test be completed in order to establish that the DEFENDANT is the father of the minor child (name omitted)." This was certainly a curious request given that the court had already issued a judgment establishing the child was issue of the marriage. It is unclear whether either petitioner's counsel or respondent's counsel ever advised their respective clients that it was hardly likely that any court would even entertain a post judgment request to, in effect, bastardize a child.
The attempts to serve the process were very unsuccessful. The attorney issued duplicate copies of his papers in February, March, April and May before service was accomplished on the petitioner's attorney on June 29, 1993. The attached Order for Hearing and Notice indicated that the hearing on the motions was to occur on July 13, 1993, at New Haven. At about this same time, the respondent failed to appear before the Family Support Magistrate on July 13, 1993, and again on August 3, 1993. On each date the Family Support Magistrate issued a capias for the respondent's detention. (Court Exhibit #1, J and K)
It was not until November 10, 1993, that the respondent's motions came before the Superior Court for visitation and the CT Page 1380 motion for DNA testing. What happened at court on that day and the complete agreement which was reached is a matter that has been intentionally clouded.[6] It is clear however, that the petitioner and the respondent met privately for a considerable period of time. They reported back to the attorneys that they had reached an accommodation wherein the respondent would consent to the termination of his parental rights as to the youngest child and that the petitioner's new husband, Bob, would adopt the child. Further the parties agreed to limited permissive visitation at a neutral site, namely the petitioner's father's home. No court action was taken regarding visitation.
Based upon the deposition transcript and the petitioner's testimony, the court concludes that the paramount consideration of the respondent was not visitation but rather, the elimination of the child support order and the arrearage for the younger child. The court further believes the testimony of the petitioner that the "accommodation" reached in the parking lot of the Superior Court included a provision that every dollar of the arrearage of child support for the younger child was to be eliminated. Each of the parties left the court with what they wanted: the respondent left eliminating the youngest child from his family, including past and future support, and the petitioner left with no change in the visitation order. Quid pro quo.
Following the court appearance, the respondent had visitation once a month for a few months. At first it was at the home of the child's maternal father. After a few months, the petitioner testified that a heated argument had occurred in front of young Peter about the wage withholding order on the respondent's pay check. Visitation was halted by the petitioner. After a few months, sporadic visitation resumed. From time to time, the respondent's lawyers would file a motion or reclaim a motion for visitation, but in the years following the divorce, the respondent never pursued with vigor the issue of visitation to the point of obtaining a court order. The respondent blames his lawyers for not getting a court order. While the lawyers may have had some responsibility, the failure rests squarely with the respondent.
The respondent was usually resourceful and successful about getting what he really wanted. In November, 1993, he wanted to totally remove the youngest child from his responsibility. He succeeded. In January, 1995, the respondent wanted to reduce his support obligation. He filed a pro se motion to modify the CT Page 1381 dissolution decree to reduce his child support obligation. He did not use a lawyer. He did not seek visitation. He was able to have the court order his former wife to appear on a date certain, February 2, 1995. At the hearing he successfully persuaded the Family Support Magistrate that his earnings were $188 per week and that his child support obligation should be reduced to $50 per week. He was found to be in arrears $5,477 as of February 22, 1995 and he was ordered to reduce the payment on the arrears from $10 per week to $5 per week. The respondent manipulated the system. He had applied for the reduction as soon as he could after he had been laid off. The existing child support order is predicated upon his represented earnings of $188 per week.
From his testimony in this court it is clear, both from his testimony and the financial affidavit which this court ordered him to produce, that he is a seasonal worker, regularly employed by a large construction company. He is generally laid off in mid winter. His present financial affidavit shows that he receives $357 per week unemployment during his layoff. His affidavit indicates he was laid off on January 16, 1998, and he will return to work on April 1, 1998. His regular rate of pay as a driver is $16.68 per hour not including overtime. For the first two weeks of 1998 he averaged $617 gross per week. His payments for child support on an annual basis are well below the Child Support Guidelines § 46b-215 et seq. recommended support level.
Shortly after that February 22, 1995, court appearance, whatever visitation the respondent had became less and less to the point in July, 1995, when even the sporadic visitation ended. The petitioner said it ended because young Peter didn't want to go for visitation at all. He reported to his mother that the respondent and his family were speaking very disparagingly about the petitioner and he didn't like hearing it. Additionally, young Peter was acutely aware that his last name was not the same as that of his mother, his psychological father, and his brother, all of whom share a common last name. Peter wants full status within the family and that to him means having the same last name as his mother. Peter and his mother have been in counseling to help Peter work through this issue.
In August of 1995, the petitioner filed papers in the probate court to change Peter's name. The respondent responded with a vengeance. He brought as many of his immediate family members as he could to the probate court hearing, a gesture likely designed to intimidate his ex-wife, the child and the court. The probate CT Page 1382 judge continued the hearing and told the respondent to hire a lawyer. His lawyers responded by the now old, tried and true measure; they filed yet another motion for visitation. The motion came to be heard in court in September. 1995.
As with the motion in court in November, 1993, the case was not presented to the court. The matter was not referred to family relations for an investigation, no argument in court was presented, no judge was asked to modify the decree. Whether the respondent, who was then well employed, feared a child support order consistent with the child support guidelines. is not clear. But neither the respondent nor his counsel pursued the visitation order. As a consequence, the respondent has not seen Peter in two and a half years.
This court is aware that the petitioner has placed obstacles in the path of visitation, sometimes for appropriate reasons, sometimes, not. But it is extremely clear to this court, if not to others, that these obstacles were pebbles, not boulders. The respondent had it within his capacity to change the court order and he never did.
For much of the time in young Peter's life, the respondent lived in very close geographic proximity to Peter. The child's male biological parent never went to the house to ask to see Peter. The respondent admits he never went to the child's school to talk to his teachers or to obtain copies of Peter's progress reports. He never asked to have a conversation, with Bob, who has very effectively parented young Peter. He never purposely went to an athletic contest of young Peter, although on one occasion he happened to be at an athletic field when Peter was playing soccer. The respondent believes that the petitioner somehow influenced the soccer coach to take Peter out of the game so that he, the respondent, would not be able to see Peter play soccer.
But the most telling fact is that the respondent never walked into a courtroom when he had the opportunity and said "I want an order granting me the right to see my son, period." In the vernacular, he was all smoke and no fire. He talked the talk, but he didn't walk the walk. This court finds that the respondent's principal motivation in virtually every court appearance was to minimize his financial exposure for child support.
Dr. Berkowitz found that notwithstanding the respondent's CT Page 1383 protestations of innocence, naivete, and passivity, he was insincere and unbelievable. The court fully agrees with these findings of the clinical psychologist. ". . [I]t must be emphasized that (the respondent's) judgment can be considered to be impaired by his strong propensity for blaming others for his own failures. His penchant for externalization of responsibility (including his admission to Attorney Rafala that he beat his wife because she wanted to be beat) onto those victimized by his behavior and/or those dependent upon him(his son) most likely constitutes part of a personality disorder." Dr. Berkowitz observed his answers during the interview to be ". . very smooth, articulate, slippery, and evasive in response to questions". Examples of his blaming others were too numerous to mention but included:
A. Blaming the petitioner for his failure to visit his son.
B. Blaming his first wife for the marital failure.
C. Blaming his first lawyer for the failure to obtain a visitation order in November, 1993, without accepting any responsibility for not attending court himself for the second divorce.
D. Blaming his son for not reminding him to attend the son's sporting events.
E. "I missed a lot of time with my first born, when her mother kept her from me out of spite."
F. "No matter what issue was broached, (the respondent's) initial tendency is to blame others. Not only did this hold true for his relationship with (the petitioner) and others involved in this matter, but also with this psychologist and the court." reported Dr. Berkowitz (Exhibit # 1, p. 9)
He did not assign responsibility for his child support arrearage, but presumably that too, is someone else's fault.
The child has clearly and unequivocally told the petitioner, the child's attorney, the DCF caseworker, and the psychologist, over an extended period of time, which period is greater than one year, that he does not desire to have a relationship with the respondent. He wishes to be adopted by his mother's husband and to assume that family name. All who have evaluated this case have concluded that this scenario would be in the best interest of CT Page 1384 this child
II. Adjudication
The court finds by clear and convincing evidence that the respondent has no ongoing parent child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and that to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; General Statutes § 45a-717 (g)(2)(C). This finding is made after a careful evaluation of all the evidence. This court is mindful of the fact that the parents were divorced and that it is often difficult to maintain the same kind of relationship that might have existed in an intact family. But even divorced non-custodial parents maintain meaningful relationships with their children, although in some cases it may be a limited relationship. Here the respondent, a responsible adult, took no vigorous, purposeful action to secure the right to see his nearby child. The great majority of the failure to maintain a relationship with his child rests squarely upon the respondent's shoulders alone.
III. Mandatory Findings
Pursuant to § 45a-717 (I) the court makes the following findings:
1) The timeliness, nature and extent of services offered. The court finds that a psychological evaluation was conducted, the respondent was represented by counsel and no services were requested.
2) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc. The court finds that the respondent has not sought and obtained any orders, neither has he violated any court orders in this action. Issues exist as to the violation of support orders and arrearages of the respondent entered in the action for dissolution of marriage.
4) The feelings and emotional ties of the child with respect to the parents and step parents, etc. The court finds that the child is bonded to his mother and her husband. He considers CT Page 1385 himself part of the family and that no emotional bonds will be broken by termination of the respondent's rights.
5) As to the age of the child. The child will be ten years of age in August. He has expressed an intelligent preference, after careful consideration, to his mother, his lawyer and to the court appointed psychologist. That preference is to terminate the parental rights of the respondent so that he may be adopted. The Appellate Court has correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander v.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD 99 (1979).
6) The efforts the respondent has made to adjust his circumstances or conditions to maintain a relationship with the child. The respondent had at least three solid opportunities to obtain court-ordered visitation. He did not. The respondent had other matters on his agenda, which to him were more important than securing a court ordered right to see his child. He did not act with the degree of diligence which would be expected of any reasonably responsible adult toward their child. The respondent had other, non-court related, opportunities to maintain a relationship with his child. He did not pursue any of them.
7) The court finds that the petitioner initially acted to prevent the respondent from mainttaining a meaningful relationship with the child. Her reasons for doing so are not clear. But the respondent had the resources, knowledge and ability to obtain a court order for visitation and he did not do so. While the petitioner bears some responsibility, any devoted and caring parent with the ability and resources of the respondent would have immediately obtained an order of visitation in 1992. The respondent did not. His actions speak volumes. His words are hollow.
An example of his hollow words as they relate to interpersonal relationships is exemplified by his words and his conduct as they relate to the mother of another of the respondent's children. He has a child, Harley, by a women named Stacy. Stacy, a pleasant and supportive woman, testified in this action for termination of parental rights. The respondent continuously refers to Stacy as his fiancee. She says they have been engaged for three years. They have been together for six CT Page 1386 years. Their common child is five years old. As with his conduct toward Peter, the respondent says the appropriate words but doesn't take the appropriate action.
IV. DISPOSITION
Based upon the foregoing findings, the court determines that it is in the child's best interest for a termination of parental rights to enter with respect to the male biological parent Peter M. II. The court has found that grounds exist to terminate the respondent's rights to the child. The court has also considered the mandatory findings and concludes from the totality of circumstances that termination of parental rights is in the child's interest. This finding is made after considering the childs' sense of time, his need for secure and permanent environment, the relationship the child has with his present family and the totality of circumstances. In Re: Juvenile Appeal,
(anonymous) 177 Conn. 648, 667-668, 420 A.2d 875 (1979). See generally, J. GOLDSTEIN, A. FREUD AND A. SOLNIT, BEYOND THE BEST INTERESTS OF THE CHILD 99 (1979). and, accordingly, a termination of his parental rights is ordered. It is further ordered that the petitioner is affirmed as the sole parent and natural guardian of the minor child.
The fee of the court appointed psychologist shall be paid one-half by the petitioner and one-half by the respondent. Any unpaid portion of the fee of the child's attorney resulting from representation of the child during the trial shall be paid one-half by each the petitioner and the respondent. These financial obligations shall be paid within thirty days.
Ordered at Middletown, Connecticut this 5th day of February, 1998.
Francis J. Foley, Presiding Judge Child Protection Session